[No. D005707. Fourth Dist., Div. One. Aug. 29, 1988.]

JIMMY SWAGGART MINISTRIES, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

1272

**COUNSEL**

Ajalat & Polley, Charles R. Ajalat, Terry L. Polley, Richard J. Ayoob, Schall, Boudreau & Gore, Richard R. Gore and Stone, Pigman, Walther, Wittman & Hutchinson for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Neal J. Gobar, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**KREMER, P. J.**—The Jimmy Swaggart Ministries (Ministries) appeals a judgment refusing a refund of sales and use taxes paid under protest to the State of California. Ministries contends the taxes burden the free exercise of religion, excessively entangle the state with religion and offend the Ninth and Tenth Amendments. Ministries also contends insufficient facts support findings it was a "retailer" within the meaning of the tax laws or that it had a sufficient nexus to California to allow imposition of the sales and use taxes, that the trial court committed various evidentiary errors and erroneously denied it leave to amend its complaint. We conclude the sales and use taxes are constitutional and that the record does not support Ministries's other contentions. Therefore, we affirm.

### FACTS

During the period in question (1974-1981), Ministries was a nonprofit religious corporation affiliated with the Assemblies of God church.[1] Ministries describes itself as "an evangelistic outreach to promote the gospel of Jesus Christ" by all available means, including "evangelistic crusades," radio and television broadcasting (both as owner and broadcaster), recording music and preaching, writing and publishing "and, [by] any and all other individual or mass media methods that presently exist or may be devised in the future to proclaim the good news of Jesus Christ."[2]

During 1974-1981, Ministries conducted numerous "evangelistic crusades" in auditoriums and arenas across the country in cooperation with

---

[1] The parties stipulated that Ministries "called itself a 'church' and 'a church-affiliated evangelistic outreach.' "

In 1980, Ministries began holding local church services in Baton Rouge, Louisiana, and applied to change its federal tax exemption from a religious organization to a church. Eventually, in 1982, the Internal Revenue Service granted the income tax class status change to "church" based on services being held at the Baton Rouge church, making the change retroactive to 1980.

[2] Ministries's constitution and by-laws provided: "That Jimmy Swaggart Ministries is called for the purpose of establishing and maintaining an evangelistic outreach for the worship of Almighty God, our heavenly Father in which the Holy Spirit will be honored according to our distinctive testimony; to assume a proper share of responsibility and privilege of propagating the gospel of Jesus Christ by all available means, both at home and in foreign lands. This outreach shall not be limited as to method, but shall specifically include evangelistic crusades; missionary endeavors; education (including pre-school, kindergarten, elementary, secondary, and post-secondary); radio broadcasting (as owner, broadcaster, and placement agency); television broadcasting (both as owner and broadcaster); and audio production and reproduction of music; audio production and reproduction of preaching; audio production and reproduction of teaching; writing, printing and publishing; and, any and all other individual or mass media methods that presently exist or may be devised in the future to proclaim the good news of Jesus Christ."

local churches. Over this period, Ministries held 23 crusades in California. The crusades lasted one to three days, with one crusade lasting six days. The crusade in California totaled 52 days over the period involved here. At the crusades, Ministries conducted services which included preaching and singing. Some of these services were recorded for later sale and/or broadcast. Outside, Ministries sold religious books, records and tapes as well as other religious and nonreligious merchandise[3] at tables for either cash or credit card.

Ministries also published a magazine, "The Evangelist," which was sold nationwide by subscription. "The Evangelist" had California subscribers. The articles in the magazine were generally of a religious nature. Ministries advertised its religious books, tapes and records for sale in the magazine[4] and included an order blank listing the various items for sale in the particular issue, their unit price and provided spaces for filling in the quantity desired and the total price. Ministries also offered items for sale on its radio and television broadcasts.

In early 1980, the Board of Equalization of the State of California (Board) became aware Ministries was selling tangible personal property at its crusades in California. The Board informed Ministries that there was no sales tax exemption for religious materials and requested Ministries to register as a seller (to facilitate reporting and paying tax on sales). Ministries asserted it was exempt under the First Amendment.

In 1981, an audit commenced. The auditor suggested Ministries was also liable for a use tax on its mail order sales to California residents. In July

---

[3] This merchandise included mugs, bowls, plates, pen and pencil sets, bud vases, communion cups, candlesticks, a replica of a Roman coin, prints of religious scenes, T-shirts with Ministries's logo, replicas of the Crown of Thorns and Ark of the Covenant. This merchandise is not strictly the subject of this lawsuit. Ministries and the board stipulated: "In October 1985, JSM and the SBE agreed that JSM could amend its prayer and eliminate its contest of the taxability of the sale and use of certain items included in paragraphs 4, 8 and 9 above which plaintiff says do not have specific religious-message content . . . that the parties will after trial try to determine the amounts by agreement if necessary or by a subsequent court hearing."

[4] For example, in the June 1981 issue of "The Evangelist," Ministries advertised: "GIANT EIGHT-TRACK TAPE SALE [¶] Five eight-tracks normally sell for $30. However, you can now get five at our special sale price of $15—that's half price. We are overstocked and have no place to store all these tapes. Our new building is underway, but it will be six months before it is completed. We have to move the stock now. Take advantage of this half-price sale— AVAILABLE IN EIGHT-TRACKS ONLY." The eight-track tapes available for sale included such titles as "You Don't Need to Understand," "Jesus is the Sweetest Name I Know," and "The Sacred Strings of Jimmy Swaggart." The ad finished by stating "AVAILABLE IN SETS OF 5 ONLY —$6 each when purchased separately. [¶] Any 5 tapes —$15 [¶] Any 10 tapes—$30 [¶] Any 15 tapes—$45."

1981, the Board advised Ministries that (1) it should register as a seller, report and pay sales tax on all sales made at its California crusades, and (2) that there was a sufficient nexus with the State of California to require Ministries to collect and report use tax on its mail order sales to California purchasers.

Ministries cooperated with the Board by making its records available. Based on the records Ministries had provided, the parties stipulated "that [Ministries] sold for use in California tangible personal property for the period April 1, 1974, through December 31, 1981, measured by payment to [Ministries] of $1,702,942.00 for mail order sales from Baton Rouge, Louisiana and $240,560.00 for crusade merchandise sales in California." The Board notified Ministries it owed sales and use taxes of $118,294.54 plus interest of $36,021.11 and a penalty of $11,829.45 for a total amount due of $166,145.10. Ministries filed a petition for redetermination with the Board, arguing exemption from the tax under the First Amendment. Following a hearing and an appeal to the Board, the Board deleted the penalty but otherwise redetermined the matter without adjustment in the amount of $118,294.54 in taxes owing plus $65,043.55 in interest. Ministries paid the amount but filed a petition for redetermination and a refund with the Board. When the Board denied Ministries's petition, Ministries brought this lawsuit, seeking a refund of the taxes paid.

Following a trial, the trial court entered judgment for the Board, ruling that Ministries was not entitled to a refund of any taxes.

DISCUSSION

I

The Sales and Use Tax Law (Rev. & Tax. Code, § 6001 et seq.)[5] requires retailers to pay a sales tax "[f]or the privilege of selling tangible personal property at retail . . . ." (§ 6051.) A "sale" includes any transfer of title of tangible personal property in any manner. (§ 6006.)

The use tax is complementary to the sales tax. It is "imposed on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer . . . for storage, use, or other consumption" (§ 6201) at the same rate as the sales tax. The use tax is on the purchaser (§ 6202) but is generally collected by the retailer at the time the sale is made (§§ 6202-6206).

---

[5] All statutory references are to the Revenue and Taxation Code unless otherwise specified.

 In an action for a refund of taxes, the taxpayer has the burden of establishing all the facts necessary to establish its right to a refund. (*El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 744-745 [215 P.2d 4], app. dism. 340 U.S. 801 [95 L.Ed. 589, 71 S.Ct. 52]; *Honeywell, Inc.* v. *State Bd. of Equalization* (1982) 128 Cal.App.3d 739, 744-745 [180 Cal.Rptr. 479].)

Neither the California Constitution nor the Sales and Use Tax Law exempts religious organizations generally from sales and use taxes.[6]

## II

 Ministries contends California's imposition of the sales and use taxes on it violates the free exercise clause of the First Amendment.[7] In support of this argument, Ministries relies primarily on the United States Supreme Court's 1943 decision in *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105 [87 L.Ed. 1292, 63 S.Ct. 870, 146 A.L.R. 81].

In *Murdock,* Jehovah's Witnesses were convicted of violating a city ordinance which required all persons canvassing within the city to procure a license and pay a fee. The Supreme Court framed the issue before it as "a single issue—the constitutionality of an ordinance which as construed and applied requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities." (*Id.* at p. 110 [87 L.Ed. at p. 1297].)

The Supreme Court observed: "The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses. It has been a potent force in various religious movements down through the years. This form of evangelism is utilized today on a large scale by various religious sects whose colporteurs carry the Gospel to thousands upon thousands of homes and seek through personal visitations to win adherents to their faith. It is more than preaching; it is more than distribu-

---

[6] California's Sales and Use Tax Law does provide a limited exemption from the sales and use tax for the serving of meals by religious organizations. (§ 6363.5.)

Several other states statutorily exempt religious organizations from sales and use taxes. (See, e.g., Ark. Stat. Ann. § 26-52-401, subds. (1), (14); Fla. Stat. Ann. § 212.06, subd. (9); Iowa Code Ann. § 422.45, subd. (3); Mo. Ann. Stat. § 144.030, subd. (19); Nev. Rev. Stat. § 372.325, subd. 5; N.J. Stat. Ann. § 54:32B-9, subd. (b)(1); N.Y. Tax Law, § 1116, subd. (a)(4); N.D. Cent. Code, § 57-39.2-04, subd. 4; Pa. Stat. Ann., tit. 72, § 7204, subd. (10).)

[7] The free exercise clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." The equivalent California constitutional provision states: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State." (Cal. Const., art. I, § 4.)

tion of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion. It also has the same claim as the others to the guarantees of freedom of speech and freedom of the press." (*Id*. at pp. 108-109 [87 L.Ed. at p. 1296], fns. omitted.)

The Supreme Court discussed *Jones* v. *Opelika* (1942) 316 U.S. 584 [86 L.Ed. 1691, 62 S.Ct. 1231, 141 A.L.R. 514], which was reargued at the same time the *Murdock* case was argued. In the first *Opelika* opinion, the court had upheld convictions against Jehovah's Witnesses for violating a similar license ordinance because the Jehovah's Witnesses had used "ordinary commercial methods of sales of articles to raise propaganda funds." (*Id*. at p. 597 [86 L.Ed. at p. 1702].) The *Opelika* court had concluded it was proper for the state to charge "reasonable fees for the privilege of canvassing." (*Ibid*.)[8] The *Murdock* court observed sometimes the determination whether an activity is "religious or purely commercial" is difficult to make; "[t]he distinction at times is vital." (*Murdock* v. *Pennsylvania, supra,* 319 U.S. at p. 110 [87 L.Ed. at p. 1297].)

"[T]he mere fact that religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection plate in church would make the church service a commercial project. The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that a religious organization needs funds to remain a going concern. But an itinerant evangelist however misguided or intolerant he may be, does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him." (*Id*. at p. 111 [87 L.Ed. at p. 1297].)

In *Murdock,* the city argued the ordinance was valid because it was "nondiscriminatory." The court rejected this argument, stating: "A license tax certainly does not acquire constitutional validity because it classifies the

---

[8] By memorandum opinion, the Supreme Court reversed the *Jones* decision "[f]or the reasons stated in the opinion of the court in [*Murdock*]." (*Jones* v. *Opelika, supra,* 319 U.S. 103 [87 L.Ed. 1290, 63 S.Ct. 890].)

privileges protected by the First Amendment along with the wares and merchandise of hucksters and peddlers and treats them all alike. Such equality in treatment does not save the ordinance. Freedom of press, freedom of speech, freedom of religion are in a preferred position." (*Id*. at p. 115 [87 L.Ed. at pp. 1299-1300].) The *Murdock* court concluded the flat license tax before it, which was unrelated to receipts or income and which was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question," was an unconstitutional restraint on the free exercise of religion. (*Id*. at pp. 113-114 [87 L.Ed. at p. 1299].)

Following *Murdock,* the Supreme Court, in *Follett* v. *McCormick* (1944) 321 U.S. 573 [88 L.Ed. 938, 64 S.Ct. 717, 152 A.L.R. 317], explained the *Murdock* holding was not restricted to itinerant preachers but also prohibited imposition of a flat license tax on Jehovah's Witnesses who earned their livelihood as evangelists or preachers in their home town. The *Follett* court stated: "Freedom of religion is not merely reserved for those with a long purse. Preachers of the more orthodox faiths are not engaged in commercial undertakings because they are dependent on their calling for a living. Whether needy or affluent, they avail themselves of the constitutional privilege of a 'free exercise' of their religion when they enter the pulpit to proclaim their faith. . . . A preacher has no less a claim to that privilege when he is not an itinerant." (*Id*. at pp. 576-577 [88 L.Ed. at pp. 940-941].)

Ministries argues there is no significant difference between hand distribution and mail distribution or between printed religious matter and recorded religious matter; in either case the distribution is entitled to "as high a claim to constitutional protection as the more orthodox types" of spreading one's religious beliefs. (See *Murdock* v. *Pennsylvania, supra,* 319 U.S. at p. 110 [87 L.Ed. at p. 1297].) We agree. Evangelism, whether by "age-old" methods or by new technologies, is protected by the free exercise clause of the First Amendment. However, we disagree with Ministries's subsequent conclusion *Murdock* and *Follett* compel us to hold the sales and use taxes here unconstitutional.

Ministries argues since the funds raised from the sale of religious materials are used to produce other religious materials to further spread the gospel and "to remain a going concern" (see *Murdock* v. *Pennsylvania, supra,* 319 U.S. at p. 111 [87 L.Ed. at p. 1297]) and payment of sales and use taxes diminishes the amount of funds available for this evangelistic work, the taxes are an unconstitutional burden on Ministries's right "to [spread] their religious beliefs through the spoken and printed word" (*ibid*.) as guaranteed by the Constitution and stated in the *Murdock* and *Follett* cases. We

disagree. Ministries has expanded the scope of those decisions beyond their holdings.

The holdings of *Murdock* and *Follett* were both limited to the constitutionality of a particular type of tax, a flat license tax which was unrelated to receipts, income or the administrative costs of a regulatory scheme and which acted as a prior restraint on the exercise of a constitutional right. The Supreme Court did not equate a financial burden in and of itself with an unconstitutional burden on the exercise of religion.

As the Supreme Court explained in *Follett* v. *McCormick, supra,* 321 U.S. at pages 577-578 [88 L.Ed. at p. 941]: "[We do] not mean that religious undertakings must be subsidized. The exemption from a license tax of a preacher who preaches or a parishioner who listens does not mean that either is free from all financial burdens of government, including taxes on income or property. We said as much in the Murdock case . . . ."

In *United States* v. *Lee* (1982) 455 U.S. 252 [71 L.Ed.2d 127, 102 S.Ct. 1051], the Supreme Court held an Amish employer could be constitutionally required to pay social security tax despite his religiously based belief forbidding the payment or receipt of social security benefits. The court acknowledged the "compulsory participation in the social security system interferes with [the Amishes'] free exercise rights," but nonetheless upheld that compulsory participation. (*Id.* at p. 257 [71 L.Ed.2d at p. 132].) The court reaffirmed its position that "[n]ot all burdens on religion are unconstitutional" and explained: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." (*Id.* at pp. 257, 261 [71 L.Ed.2d at pp. 132, 134-135].) The court held a "state may justify a limitation on religious liberty by showing that it is essential to accomplish some overriding governmental interest." (*Id.* at pp. 257-258 [71 L.Ed.2d at p. 132].)[9] The justifying governmental need in *Lee* was assuring mandatory and continuous participation in and contribution to the nation-

---

[9] Compare *Lyng* v. *Northwest Indian Cemetery Protective Ass'n* (1988) 485 U.S. 439, 451 [99 L.Ed.2d 534, 547-548, 108 S.Ct. 1319, 1326], involving the government's right to build a road on National Forest land through a traditional Indian burial ground despite its potentially "devastating effects" on the practice of a particular religion. In a narrow interpretation of the free exercise clause, the Supreme Court rejected a requirement the government must demonstrate a compelling need for the road at that particular location to justify the burden on the practice of religion. The court stated: "The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the goverment cannot do to the individual, not in terms of what the individual can exact from the government.' [Citation.]" (*Ibid.*)

wide social security system. (*Id*. at pp. 258-259 [71 L.Ed.2d at pp. 133-134].)

Subsequently, in *Minneapolis Star* v. *Minnesota Comm'r of Rev.* (1983) 460 U.S. 575, 586 [75 L.Ed.2d 295, 305, 103 S.Ct. 1365], (*Minneapolis Star*) the Supreme Court recognized a state's general interest in raising revenue is an important governmental interest; "that interest is critical to any government." In *Minneapolis Star,* the Supreme Court held that Minnesota's use tax which taxed newspapers differently than other enterprises (taxing the paper and ink used in the paper, not just the finished product) and which singled out a handful of newspapers for this different treatment, was unconstitutional because it discriminated against the press. The court, however, in the course of its opinion, also explained: "our cases have consistently recognized that nondiscriminatory taxes on the receipts or income of newspapers would be permissible." (*Id*. at p. 587, fn. 9 [75 L.Ed.2d at p. 306]; accord *Arkansas Writers' Project, Inc.* v. *Ragland* (1987) 481 U.S. 221, 229 [95 L.Ed.2d 209, 219, 107 S.Ct. 1722, 1727].)[10]

The Supreme Court made this statement in response to an argument a generally applicable sales tax could never pass muster under the First Amendment. The newspapers cited in support of their argument the *Follett, Murdock,* and *Opelika* cases. The court responded: "Whatever the value of those cases as authority after *Breard,* [11] we think them distinguishable from a generally applicable sales tax. In each of those cases, the local government imposed a flat tax, unrelated to the receipts or income of the speaker or to the expenses of administering a valid regulatory scheme, as a *condition* of

[10] In *Arkansas Writers' Project, Inc.* v. *Ragland, supra,* 481 U.S. 221, 229 [95 L.Ed.2d 209, 219, 107 S.Ct. 1722, 1727], the Supreme Court held Arkansas's sales tax scheme which taxed general interest magazines but exempted newspapers and religious, professional, trade and sports journals violated the First Amendment because it was discriminatory. The court found the selective taxation was "more disturbing" than the tax in *Minneapolis Star* because the Arkansas tax scheme determined tax status based entirely on the magazine's content. (*Ibid*.) The Supreme Court affirmed its *Minneapolis Star* position "that a genuinely nondiscriminatory tax on the receipts of newspapers would be constitutionally permissible." (*Ibid*.)

[11] In *Breard* v. *Alexandria* (1951) 341 U.S. 622 [95 L.Ed. 1233, 71 S.Ct. 920, 35 A.L.R.2d 335], the Supreme Court upheld a conviction against a door-to-door magazine subscription salesman for violating an ordinance prohibiting door-to-door solicitation of private residences without a prior request or invitation from the resident. The court stated "Subscriptions may be made by anyone interested in receiving the magazines without the annoyances of house-to-house canvassing. We think those communities that have found these methods of sale obnoxious may control them by ordinance. It would be, it seems to us, a misuse of the great guarantees of free speech and free press to use those guarantees to force a community to admit the solicitors of publications to the home premises of its residents." (*Id*. at pp. 644-645 [95 L.Ed. at p. 1249]; see also *Frisby* v. *Schultz* (1988) 487 U.S. 474 [101 L.Ed.2d 420, 108 S.Ct. 2495] (upholding an ordinance prohibiting picketing in front of a private residence against a First Amendment challenge).)

the right to speak. By imposing the tax as a condition of engaging in protected activity, the defendants in those cases imposed a form of prior restraint on speech, rendering the tax highly susceptible to constitutional challenge. [Citations.] In that regard, the cases cited by Star Tribune do not resemble a generally applicable sales tax." (*Minneapolis Star* v. *Minnesota Comm'r of Rev., supra,* 460 U.S. at p. 587, fn. 9 [75 L.Ed.2d at p. 306], italics in original.)

Relying on this reasoning in *Minneapolis Star,* the Second District, Division Seven of our Court of Appeal in *Institute in Basic Youth Conflicts, Inc.* v. *State Bd. of Equalization* (1985) 166 Cal.App.3d 1093 [213 Cal.Rptr. 98] (*Institute*), held the California use tax could be imposed on a nonprofit religious organization without offending the free exercise clause. *Institute* involved a nonprofit religious organization which conducted religious seminars across the country. The organization charged individuals one fee for its seminar and a separate fee for the printed syllabus. The organization also sold religious books and pamphlets, which were not directly related to the seminars, through the mail. The organization asserted California could not impose sales and use taxes on its sale of religious literature without offending the free exercise clause.

The Court of Appeal rejected this argument as to the use tax. Relying on *Minneapolis Star's* language concerning the constitutionality of a generally applicable sales tax and distinguishing *Murdock* and *Follett,* the Court of Appeal concluded the use tax did not offend the free exercise clause because "[t]he tax in this case is not a flat tax and it is related to the receipts or income of the plaintiff." (*Id.* at p. 1105.) The court also pointed out the use tax is on the consumer, not the religious organization/seller; the religious organization/seller only collects the tax on behalf of the consumer. (*Id.* at p. 1106.)

The *Institute* court also relied on our Supreme Court's decision in *Watchtower B. & T. Soc.* v. *County of L. A.* (1947) 30 Cal.2d 426, 431 [182 P.2d 178], certiorari denied 332 U.S. 811, which had upheld an assessment of an ad valorem tax on religious literature stored in Los Angeles County. The California Supreme Court stated: "It has never been supposed that the property used in the exercise of the rights of freedom of press or religion is not subject to a uniform tax for revenue imposed upon all alike." (*Id.* at p. 430.)

The *Institute* court, however, did not similarly uphold imposition of the California sales tax because the Legislature had cast California's sales tax as a "privilege or occupation tax imposed upon the privilege of selling tangible

personal property at retail." (*Institute in Basic Youth Conflicts, Inc.* v. *State Bd. of Equalization, supra,* 166 Cal.App.3d at p. 1105; § 6051.) The court explained: ". . . the method [the Legislature] has chosen, a privilege or occupation tax, is constitutionally infirm under the First Amendment when applied to respondent. As stated in *Murdock, supra,* 319 U.S. at page 115 . . . , '[t]he privilege in question exists apart from state authority. It is guaranteed the people by the Federal Constitution.' Accordingly, respondent cannot be taxed for the privilege of doing that which it has already the right to do." (*Id.* at p. 1106.)

The Board in *Institute* argued California's interest in raising revenue justified the sales tax. The Court of Appeal was not persuaded. It concluded there was " 'an alternative means of achieving the same interest without raising concerns under the First Amendment,' " that is, the use tax which the Legislature had cast as "[a]n excise tax . . . on the storage, use, or other consumption in this state of tangible personal property" (§ 6201). (*Institute in Basic Youth Conflicts, Inc.* v. *State Bd. of Equalization, supra,* 166 Cal.App.3d at p. 1106.) We believe the *Institute* court erred when it relied on a privilege analysis to find the sales tax unconstitutional.

The United States Supreme Court, in *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076], rejected this privilege analysis for determining the constitutionality of a tax. Before the *Complete Auto* decision, courts had focused on whether a tax was a tax directly upon the "privilege" of engaging in a constitutionally protected activity (in which case it was invalid) or whether it was a tax merely on income earned (in which case it was valid). (Compare, e.g., *Railway Express Agency* v. *Virginia* (1954) 347 U.S. 359, 362, 369 [98 L.Ed. 757, 761-762, 74 S.Ct. 558] with *Railway Express Agency* v. *Virginia* (1959) 358 U.S. 434, 437-439 [3 L.Ed.2d 450, 453-454, 79 S.Ct. 411], where the Virginia Legislature recast an "annual license tax" levied on gross receipts for the "privilege of doing business in this State" to a "franchise tax" on "intangible property" in the form of a "going-concern" value as measured by gross receipts.) In *Complete Auto,* the Supreme Court held the critical question was not whether the tax was on a "privilege," but whether the tax had a "forbidden effect." The court explained: "There is no economic consequence that follows necessarily from the use of the particular words, 'privilege of doing business,' and a focus on that formalism merely obscures the question whether the tax produces a forbidden effect." (*Complete Auto Transit, Inc.* v. *Brady, supra,* 430 U.S. at p. 288 [51 L.Ed.2d at p. 337].)

The Court of Appeal in *Institute* misfocused on how the Legislature labeled the sales tax (a "privilege") and thereby improperly focused on

formalism rather than on substance.[12] We believe the substantive effect of the sales tax on a religious organization produces no forbidden effect.

As the *Institute* court itself recognized, sales and use taxes are "complementary": " '. . . [i]n substance, the sales and use tax laws constitute a double filter designed to catch all transactions which result in tangible personal property joining the aggregate of capital assets within the state.' " (166 Cal.App.3d at pp. 1098, 1106.) This "double filter" produces one effect; not two. (Accord *Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340, 344 [98 L.Ed. 744, 748, 74 S.Ct. 535]: "The practical and legal effect of the Maryland statute . . . is to make the vendor liable for a use tax due from the purchaser. In economic consequence, it is identical with making him pay a sales tax.") That effect is not forbidden by the Constitution. The Supreme Court so concluded in *Minneapolis Star* where it stated a generally applicable sales tax is constitutionally permissible. (*Minneapolis Star* v. *Minnesota Comm'r of Rev., supra,* 460 U.S. at p. 587, fn. 9 [75 L.Ed.2d at pp. 305-306].) While *Minneapolis Star* involved newspapers sales rather than sales by a religious organization, we see no reason to distinguish between the two in this situation, particularly in light of the Supreme Court's comments in *Heffron* v. *Int'l Soc. for Krishna Consc.* (1981) 452 U.S. 640 [69 L.Ed.2d 298, 101 S.Ct. 2559].

In the *Krishna* case, the Supreme Court faced a challenge based on the free exercise clause to a Minnesota statute requiring a religious organization desiring to distribute and sell religious literature and to solicit donations at a state fair to conduct those activities only at an assigned location within the fairgrounds (i.e., at an assigned booth of which there were only a limited number available on a first come, first served basis). The Supreme Court recognized the Krishnas' oral and written dissemination of their religious views and doctrines was protected by the First Amendment and that this protection was not lost because the written materials sought to be distributed were sold rather than given away or because the Krishnas solicited contributions or gifts in the course of propagating their faith. (*Id.* at p. 647 [69 L.Ed.2d at p. 306].) The Supreme Court, however, went on to say: "It is

---

[12]Compare *Covenant Community Church* v. *Lowe* (Tenn. 1985) 698 S.W.2d 339 [58 A.L.R.4th 267], appeal dismissed 475 U.S. 1078, where the Tennessee Supreme Court upheld imposition of a 5 percent privilege tax on the occupancy of motel rooms on a church which rented motel rooms for conducting its services and providing religious instruction. The court explained: "The 5% privilege tax imposed upon a hotel and motel occupancy in Knox County is not a tax on tithes and offerings, as argued by Covenant, nor is it even an indirect tax on tithes and offerings. It is a tax upon the secular activity of occupying a hotel or motel room, and Covenant has freely chosen to occupy such rooms. The act does not bar or limit any religious practice and, thus, we conclude that the free exercise rights of appellant church have not been violated." (*Id.* at p. 341.)

also common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. [Citations.] As the Minnesota Supreme Court recognized, the activities of [the Krishnas], like those of others protected by the First Amendment, are subject to reasonable time, place, and manner restrictions. [Citations.]" (*Ibid.*)

The Supreme Court upheld the state's authority to restrict the Krishnas to specified locations on the fairground based on the state's interest "in protecting the 'safety and convenience' of persons using a public forum." (*Id.* at p. 650 [69 L.Ed.2d at p. 308].) The Supreme Court concluded: "None of our cases suggest that the inclusion of peripatetic solicitation as part of a church ritual entitles church members to solicitation rights in a public forum superior to those of members of other religious groups that raise money but do not purport to ritualize the process. Nor for present purposes do religious organizations enjoy rights to communicate, distribute, and solicit on the fairgrounds superior to those of other organizations having social, political, or other ideological messages to proselytize. These nonreligious organizations seeking support for their activities are entitled to rights equal to those of religious groups to enter a public forum and spread their views, whether by soliciting funds or by distributing literature." (*Id.* at pp. 652-653 [69 L.Ed.2d at p. 309].)

By analogy, a religious organization which seeks to disseminate its religious message through sales of religious books, tapes and records should not enjoy rights to communicate and distribute their message superior to those of "other organizations having social, political, or other ideological messages to proselytize" (*ibid.*), such as newspapers, and therefore, like the "other organizations" should be subject to the sales tax.

Ministries nonetheless argues the sales tax acts as a prior restraint on the free exercise of religion because, under the statutory scheme, sellers are required to register before selling their products. (See §§ 6066-6074; Cal. Code Regs., tit. 18, § 1699.) This registration requirement, Ministries asserts, is no different from the flat license tax in *Murdock.* We disagree.

In *Murdock,* the Supreme Court explained: "The constitutional difference between such a regulatory measure and a tax on the exercise of a federal right has long been recognized. While a state may not exact a license tax for the privilege of carrying on interstate commerce [citations], it may, for example, exact a fee to defray the cost of purely local regulations in spite of the fact those regulations incidentally affect commerce. 'So long as they do not impede the free flow of commerce and are not made the subject of

regulation by Congress, they are not forbidden.' [Citations.]" (*Murdock* v. *Commonwealth of Pennsylvania, supra,* 319 U.S. at p. 114, fn. 8 [87 L.Ed. at p. 1299].)

Here, the permit process is part of a regulatory scheme to facilitate the payment of sales taxes; it only incidentally affects religion. No fee was charged for registering and the taxes were due regardless whether Ministries had preregistered. Contrary to Ministries's assertion, the registration requirement does not turn the sales tax into an unconstitutional prior restraint on the free exercise of religion.[13]

Nor does the sales tax restrain the dissemination of a religious message as did the license requirements in the *Murdock* line of cases. The sales tax is not imposed as a precondition of disseminating the message, but is imposed only after the message has been successfully disseminated, i.e., a sale has been made.

█ We conclude California's imposition of sales and use taxes on a religious organization does not violate the free exercise clause of the First Amendment.[14]

---

[13] In support of their argument the sales tax produces a forbidden effect, Ministries quotes the following warning by the Supreme Court in *Murdock* v. *Pennsylvania, supra,* 319 U.S. at page 112 [87 L.Ed. at p. 1298]: "Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance." .

Our California Supreme Court explained 50 years ago in *Watchtower B. & T. Soc.* v. *County of L. A., supra,* 30 Cal.2d at page 432: "While the power to tax may involve the power to destroy it is clear that no such result will be accomplished by the tax here imposed. The property here involved is required to bear only its share of the burden of the maintenance of the government which is for its protection equally with other property in Los Angeles County. The very liberty invoked is made realistic by the protection afforded by that government."

[14] Ministries also cites in support of its position an Attorney General opinion holding the imposition of sales and use taxes on educational materials supplied to students in a church-related school would violate the religion clauses of the First Amendment. (63 Ops.Cal. Atty.Gen. 69 (1980).) Ministries implies the Attorney General is bound by this opinion because the opinion has not been overruled or otherwise withdrawn by the Attorney General. The Board argues this opinion no longer represents the Attorney General's position. During oral argument, the Deputy Attorney General representing the Board informed the court he had obtained express authorization from his supervisors to argue against the earlier Attorney General opinion.

Initially, we note while it is true, as Ministries points out, that this opinion has not been overruled by the Attorney General, it is also true the Attorney General has not affirmed this position either; there have been no new opinions issued on this specific topic in the past eight years. Opinions of the Attorney General are issued in response to specific questions posed by state legislators, officers and agencies and are not issued gratuitously. (See Gov. Code, § 12519.) Second, opinions of the Attorney General are advisory only and do not carry the weight of law. (*People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 870 [136 Cal.Rptr. 429].) We find the Attorney General's opinion unpersuasive in its reliance on a privilege analysis and in light of subsequent court decisions.

## III

 Ministries contends imposition of the use tax is unconstitutional because it offends the establishment clause of the First Amendment.[15]

"[F]or the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." (*Walz* v. *Tax Commission* (1970) 397 U.S. 664, 668 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].) The Supreme Court has observed: "The language of the Religion Clauses of the First Amendment is at best opaque, particularly when compared with other portions of the Amendment. Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be 'no law *respecting* an establishment of religion.' A law may be one 'respecting' the forbidden objective while falling short of its total realization. A law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612 [29 L.Ed.2d 745, 755, 91 S.Ct. 2105], overruled on other grounds in *Mueller* v. *Allen* (1983) 463 U.S. 388 [77 L.Ed.2d 721, 103 S.Ct. 3062], italics in original.)

In *Lemon* v. *Kurtzman, supra,* at pages 612-613 [29 L.Ed.2d at p. 755], the Supreme Court announced three "tests" which a statute must pass to avoid the prohibition of the establishment clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, [citation]; finally, the statute must not foster 'an excessive government entanglement with religion.' "

Ministries does not contest the secular purpose of the sales and use taxes; they are clearly directed to the secular purpose of raising revenue.[16] Nor

---

[15]The establishment clause of the First Amendment provides: "Congress shall make no law respecting an establishment of religion . . . ." The equivalent California constitutional provision states: "The Legislature shall make no law respecting an establishment of religion." (Cal. Const., art. I, § 4.)

[16]Note *Mueller* v. *Allen, supra,* 463 U.S. at pages 394-395 [77 L.Ed.2d at p. 728], where the Supreme Court observed: "Under our prior decisions, governmental assistance programs have consistently survived this inquiry even when they have run afoul of other aspects of the *Lemon* framework. [Citations.] This reflects, at least in part, our reluctance to attribute

does Ministries, in its establishment clause argument, argue the taxes' principal or primary effect either advances or inhibits religion. The primary effect of the taxes is raising revenue. To the extent Ministries argues the taxes inhibit religion, that argument has been made and discussed in the context of the free exercise clause. Ministries focuses on the third test— excessive governmental entanglement.

The Supreme Court has recognized total separation between church and state "is not possible in an absolute sense"; "[s]ome relationship between government and religious organizations is inevitable." (*Lemon* v. *Kurtzman, supra,* 403 U.S. at p. 614 [29 L.Ed.2d at p. 756].) "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." (*Ibid.*)

The taxation area is one where there is necessarily some entanglement between church and state, whether the state imposes a tax or grants an exemption. ■ As the Supreme Court observed in *Walz* v. *Tax Commission, supra,* 397 U.S. 664, a case upholding New York's property tax exemption for religious organizations on property used exclusively for religious worship against an establishment clause challenge: "Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry, however. We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. The test is inescapably one of degree. Either course, taxation of churches or exemption, occasions some degree of involvement with religion. Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes.

"Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them." (*Id.* at pp. 674-675 [25 L.Ed.2d at pp. 704-705].) The *Walz* court concluded: "In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." (*Id.* at p. 675 [25 L.Ed.2d at p. 705].)

One commentator has observed: "Entanglement forms the basis of five first amendment doctrines: (1) In challenges to government action under

unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute."

the establishment clause, the action is unconstitutional if it creates excessive administrative entanglement between church and state. (2) Under the establishment clause, the action is also unconstitutional if it turns over traditionally governmental powers to religious institutions. (3) In establishment clause challenges, the challenged action is subjected to stricter scrutiny if it breeds religiously based political divisiveness. (4) In seeking a religiously based exemption from a law or regulation, a party *may* be able to prevail under the establishment clause by showing that enforcement would create excessive administrative entanglement. (5) Courts and other agencies of government may not inquire into pervasively religious issues." (Tribe, American Constitutional Law (1988) § 14-11, pp. 1226-1227, italics in original.)

▋ Ministries claims there would be excessive governmental entanglement with its organization as a result of the difficulty of separating "sales" from "donations" and because it would be forced to hire "large staffs of people and go to very significant expense to deal with the government auditors, there would be a huge involvement of government auditors determining what motivations were 'purely' religious (i.e., a pure donation), and to what extent the donor was motivated by the religious objective of receiving the religious material." This argument goes to excessive administrative entanglement.

Administrative entanglement has been found excessive where religious and state employees must work closely together to carry out the statutory scheme, when the state becomes involved in scrutinizing religious content or when enforcement requires government investigators to make on site inspections or engage in surveillance of the religious organization to ensure a secular purpose is served. (See *Aguilar* v. *Felton* (1985) 473 U.S. 402, 411, 414 [87 L.Ed.2d 290, 298-299, 300-301, 105 S.Ct. 3232]; *Larson* v. *Valente* (1982) 456 U.S. 228, 255 [72 L.Ed.2d 33, 54-55, 102 S.Ct. 1673]; *Tony & Susan Alamo Foundation* v. *Sec'y of Labor* (1985) 471 U.S. 290 [85 L.Ed.2d 278, 105 S.Ct. 1953]; American Constitutional Law, *supra,* at § 14-11, p. 1227.)

On its face, the statutory scheme does not result in this sort of administrative entanglement. The statutory scheme does not involve state employees in the day-to-day operations of Ministries. Contrary to Ministries's assertion, imposition of the sales and use taxes does not involve the government in questioning the religious nature of the materials involved nor the motivation for selling or purchasing the items since the materials are subject to the sales and use taxes regardless of content or motive. The critical question is not whether the materials are religious, but whether there is a

sale or use, a question which involves only a secular matter. Nor does the statutory scheme require any on-site, continuing inspection. Contrary to Ministries's suggestion, the Sales and Use Tax Law does not contemplate "official and continuing surveillance" (see *Walz* v. *Tax Commission, supra,* 397 U.S. at p. 675 [25 L.Ed.2d at p. 705]) by government auditors.

Nor does the record support Ministries's factual assertions. Ministries's assertion it was "impossible" to separate "sales" from "donations" rests largely on the testimony of a certified public accountant who conducted an audit of Ministries's books. This accountant, in his financial statement for Ministries, lumped "sales" and "contributions" together because, in hindsight, reviewing books he had not kept, he felt unable to accurately segregate Ministries's income into "sales" versus "donations." He testified part of this difficulty was due to people sending in more than the cost of a particular item (e.g., someone could send in $100 for a $5 album) and "the mail room—they would charge [all of] it to a donation." The accountant opined this difficulty in separating sales from donations could exist even when an order blank listing the price accompanied the request for the album. He stated, in his opinion, there would need to be "intensive training of the existing personnel [in the mail room] as to the difference between a donation and a purchase or what portion is a purchase and what portion is a donation and monitoring of that."

While this testimony tends to support Ministries's position, the trial court was not required to accept it, particularly when much of the accountant's testimony was based on the difficulties he encountered in resurrecting what had happened in the past rather than the difficulties in ascertaining the amount of sales versus donations in the future. Moreover, there was other evidence indicating Ministries had a sophisticated accounting staff and had recently computerized its accounting and that Ministries in its own books and for purposes of obtaining a federal income tax exemption segregated "retail sales" from "donations."[17]

---

[17] In its books, Ministries had at least six categories for donations ("crusade," "radio," "t.v.," "mission," "radio stations" and "other") and at least four categories for sales ("retail," "wholesale," "meeting & crusade," and "master charge"). Ministries's books also had a category for "sales Fgt. shipping."

In its 1980 application for recognition of an exemption from federal taxes under section 501(c)(3) of the Internal Revenue Code, Ministries stated it had ". . . four primary sources of financial support: [¶] (1) Donations are received by collections made during the religious services conducted three (3) times per week at the Church . . . and during special evangelistic services conducted worldwide in municipal auditoriums; and through contributions solicited from those attending services in Baton Rouge, Louisiana and the general public either by direct personal appeal, by radio and television programs, by appeals made in the monthly publication 'The Evangelist', or other direct mail solicitation. [¶] (2) Monies received from the sale of copyrighted religious material such as books, pamphlets, records and tapes. [¶] (3)

Neither Ministries's difficulty in establishing past "sales" from its books due to its past accounting practices nor the requirement of future record-keeping involve the government with an excessive entanglement with religion so as to violate the establishment clause.[18]

## IV

 Ministries contends the sales and uses taxes should not have been imposed here because Ministries was not a "retailer engaged in business in this state" within the meanings of sections 6013 and 6203 and Ministries did not have a sufficient nexus to California and therefore could not be taxed without offending the commerce clause. These issues involve determinations of factual matters (which Ministries argues insufficient evidence supports) but these issues were not raised by Ministries in its claim for a refund from the Board.

As a prerequisite for bringing a suit for a tax refund, the taxpayer must first present a claim for a refund to the Board. (§ 6932.) Issues not raised in the claim for a refund may not be raised in a suit for a refund; the suit may be brought only "on the grounds set forth in the claim." (§ 6933; *Atari, Inc.* v. *State Bd. of Equalization* (1985) 170 Cal.App.3d 665, 672 [216 Cal.Rptr. 267]; *Duffy* v. *State Bd. of Equalization* (1984) 152 Cal.App.3d 1156, 1163 [199 Cal.Rptr. 886].) "The claim for refund thus frames and restricts the issues for litigation." (*American Alliance Ins. Co.* v. *State Bd. of Equalization* (1982) 134 Cal.App.3d 601, 609 [184 Cal.Rptr. 674, 30 A.L.R.4th 865].) "Failure to exhaust administrative remedies before the

Fees received from the sale of radio broadcast time to religious programmers sharing similar beliefs with the [Ministries]. [¶] (4) Gift annuities, bequests, donations in trust, and other gifts received through estate planning guidance and other fund-raising efforts established by [Ministries's] Stewardship Department."

In its 1981 filings for a federal income tax exemption, Ministries distinguished between "gifts, grants, and contributions received" and "gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is not a business unrelated to the organization's charitable, etc. purpose" for the years 1977 through 1980, distinguished between the "gifts, grants, and similar amounts received" and "gross sales minus returns and allowances" for 1981, and attached comments separately addressing "the sales of religious books, records, and tapes" and "donations."

[18]Compare *Tony & Susan Alamo Foundation* v. *Sec'y of Labor, supra,* 471 U.S. at pages 305-306 [85 L.Ed.2d at page 291], where the court noted the recordkeeping requirements of the Fair Labor Standards Act ". . . bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion. The Establishment Clause does not exempt religious organizations from such secular governmental activity as fire inspections and building and zoning regulations [citation] and the recordkeeping requirements of the Fair Labor Standards Act, while perhaps more burdensome in terms of paperwork, are not significantly more intrusive into religious affairs." (Fns. omitted.)

Board is a jurisdictional procedural defect which bars court action contesting imposition of tax. [Citations.]" (*Duffy* v. *State Bd. of Equalization, supra,* 152 Cal.App.3d at p. 1163; *Aronoff* v. *Franchise Tax Board* (1963) 60 Cal.2d 177, 180-181 [32 Cal.Rptr. 1, 383 P.2d 409], app. dism. 375 U.S. 451 [11 L.Ed.2d 477, 84 S.Ct. 525].)

■ As the court explained in *Atari, Inc.* v. *State Bd. of Equalization, supra,* 170 Cal.App.3d at page 673: "The rationale behind the rule of confining a complaint and trial to issues raised in the claim for refund is exhaustion of remedies. [Citation.] Prior to seeking relief from the superior court, a taxpayer must present matters of law and fact to the State Board of Equalization so that the Board may be afforded the opportunity to rectify any mistake in tax collection. [Citation.] Such a rule prevents having an overworked court consider issues and remedies available through administrative channels."

The parties here stipulated: "Exhibits '1' and '2' to the complaint constituted the argument and evidence presented administratively on [Ministries's] Petition for Redetermination and Claim for Refund. The complaint herein (paragraph 12) bases [Ministries's] claim to Refund upon the grounds stated in exhibit '1' to the complaint alleging, 'In summary, it is alleged that California cannot impose a sales or use tax upon distribution of Bibles, religious books, religious tapes and other religious materials in the State of California because to do so would constitute an interference with the free exercise of religion as set forth in Article I, Section 4 of the California Constitution, and because it is a violation of the First Amendment to the Constitution of the United States, made applicable to the State of California under the provisions of the Fourteenth Amendment to the Constitution of the United States.' "

■ Ministries contends its statement in its claim for a refund asserting "California cannot constitutionally impose a sales tax" was sufficient to raise all constitutional issues. We disagree.

Section 6904 states "[e]very claim shall be in writing and *shall state the specific grounds* upon which the claim is founded." (Italics added.) The only constitutional ground Ministries specified was the First Amendment; no other constitutional grounds were stated. To adopt Ministries's position would require us to rewrite section 6904, replacing its requirement of "specific grounds," with a general denial of tax liability standard. We decline to do so.

Ministries contends it can raise these issues in this action because the Board "denied *any* exemption applied to the imposition of either the sales

tax or the use tax collection liability" and, in its staff analysis of Ministries's petition for redetermination, stated "[e]xamination of petitioner's activities in California disclosed that petitioner has sufficient nexus in California to be required to register as a seller with the Board." Ministries asserts it thus raised the issues. This argument is without merit. These statements say nothing as to whether the issues were disputed; whether Ministries made any claims on these bases before the Board. Indeed, as to the nexus issue in particular, our review of the record indicates Ministries has overlooked another statement by the Board. In the decision and recommendations of the hearing officer, there is the following statement: "Counsel [for Ministries] does not argue nexus."

Ministries also argues it was not required to exhaust its administrative remedies on these issues because it would have been futile to do so and because "important questions of public policy are involved." Nothing in the record indicates it would have been futile to raise these issues. Nor do these particular issues raise "important questions of public policy," rather they raise factual questions, the determination of which is not a matter of "public policy" but a matter of evidence.

V

■ Ministries contends the sales and use taxes offend the Ninth and Tenth Amendments of the federal Constitution.[19]

Ministries argues: "The protection of religious liberty was a keystone of the Constitution. The People reserved this area to themselves and did not grant power to the Government in this area. The following confirm this: (1) government generally is limited . . . . This is a government of the people who have 'inalienable rights endowed by their Creator';[20] (2) this area was of such importance to the People and the founding fathers . . . that it would not be an area reserved to the States, but rather would be reserved to the People; (3) the States were also limited by the people as to issues of

---

[19]These arguments were also not raised in Ministries's refund claim.

[20]Ministries refers to the following language attributed to The Annals of America, volume 3, page 185, H.A. Washington, II, pages 327-333, and quoted by Ministries as follows: "One of the main grievances of the anti-Federalists was the omission of a bill of rights from the Constitution. The framers had briefly discussed such an addition [but] rejected the idea for a number of reasons. . . A second, and even more pertinent objection was the belief that every man has certain natural inalienable rights that need not be enumerated. In contrast to the Federalist viewpoint, those who supported a list of fundamental rights believed that such an enumeration would provide a needed restraint on the powers of the government. In addition, the courts would have a basis for decisions when a person's rights were infringed upon. . . Thomas Jefferson . . . agreed with those who advocated a bill of rights."

religious freedom in States bills of rights, and (4) the fear of any implication that government could inhibit or impede these inalienable rights resulted in the Ninth and Tenth Amendments making it particularly clear.

"A use tax collection liability impeding the distribution of the Gospel to religious adherents is surely contrary to this history and reservation of this power over religious matters to the people under the Ninth and Tenth Amendments."

We are not surprised to see Ministries has not cited any authorities to support an argument based on the Ninth and Tenth Amendments; we find the argument singularly unpersuasive.

The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The United States Supreme Court has explained: "The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments." (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 488 [14 L.Ed.2d 510, 517, 85 S.Ct. 1678], (conc. opn. Goldberg, J.).)

The Ninth Amendment has no application here because the rights at issue—free exercise of religion and separation of church and state—*are* enumerated in the Constitution, in the first two clauses of the First Amendment.

The Tenth Amendment provides: "The power not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Like the Ninth Amendment, the Tenth Amendment has no application here. The power involved here—the power to tax—is inherently a power of the government, not of individual citizens, as the framers recognized by giving Congress the "power to lay and collect taxes." (U.S. Const., art. I, § 8.)

## VI

Ministries contends "[e]vidence regarding the burdens resulting from imposition of the use tax collection liability" and "[l]etters from the Internal Revenue Service" were erroneously excluded. Ministries also asserts

"[v]arious other trial court errors" occurred, including exclusion of testimony regarding the spiritual needs of physically handicapped and imprisoned adherents, the exclusion of testimony that much of the religious materials involved are not available commercially, exclusion of testimony regarding the Board's compulsion to register and pay taxes and the court's refusal to allow the pleadings to be amended.

Ministries does not specify what particular evidence or letters were excluded, does not cite where in the record this evidence was excluded, does not cite any authorities in support of its claim of error and does not make any argument beyond its assertion error occurred. ▮ "Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court. [Citation.]" (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].) We, therefore, decline to discuss these asserted errors.

## DISPOSITION

The judgment is affirmed.

Work, J., and Todd, J., concurred.

A petition for a rehearing was denied September 28, 1988, and appellant's petition for review by the Supreme Court was denied November 17, 1988.