[No. S022285. Dec. 31, 1992.]

TITLE INSURANCE COMPANY OF MINNESOTA, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

[And six other cases.]*

*Western Title Insurance Company v. State Board of Equalization (No. 837641); Ticor Title Insurance Company of California v. State Board of Equalization (No. 837649); Ticor Title Insurance Company v. State Board of Equalization (No. 837680); Chicago Title Insurance Company v. State Board of Equalization (No. 850786); First American Title Insurance Company v. State Board of Equalization (No. 852932); Transamerica Title Insurance Company v. State Board of Equalization (No. 868556).

## COUNSEL

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Timothy G. Laddish, Assistant Attorney General, and Richard F. Finn, Deputy Attorney General, for Defendant and Appellant.

Atwood, Knox & Anderson, Atwood, Knox, Anderson, Uzzi & Dinapoli, Stanford H. Atwood, Jr., Robert Knox, John H. Blake, White & Case, Harry G. Melkonian, David J. Wilson, Jill H. Silfen, Paul C. Rooney, Jr., Darren R. Fortunato, Gibson, Dunn & Crutcher, John A. Arguelles, Norman B. Barker and Maureen McGuirl for Plaintiff and Respondent.

O'Melveny & Meyers, Warren Christopher, Frederick A. Richman, Thomas M. McCoy, Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller and Eric J. Miethke as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**PANELLI, J.**—We granted review to decide whether title insurers may be taxed on claims paid by underwritten title companies pursuant to underwriting agreements between the two. We conclude that they may not be so taxed. Additionally, we find that the State Board of Equalization failed to properly raise the defense that the title insurers should have been taxed on the total premiums paid by the insureds to the underwritten title companies. Therefore, we do not reach the premiums issue. Accordingly, we reverse the judgment of the Court of Appeal.

## I. Stipulated Facts

These consolidated actions are for refunds of taxes levied against title insurers. The refund actions were submitted for decision on the basis of a written stipulation of facts. We summarize the stipulated facts below.

Plaintiffs are seven corporations licensed to do business in California as title insurers. The insurers issue all or some of their title policies through underwritten title companies (sometimes referred to hereafter as title companies). Pursuant to a written underwriting agreement with the title insurer, to which those seeking title insurance are not a party, the underwritten title company conducts a title search and examination and prepares a preliminary report on the conditions under which title insurance would be available. Acting as the title insurer's agent, the underwritten title company issues the title insurance policy using forms provided by the insurer, determines the premium from the insurer's rate schedule, and collects the premium. According to the terms of the underwriting agreement, the underwritten title company retains most of the premium fee (usually about 90 percent) for itself. The title company pays the remainder over to the title insurer for its acceptance of the risk of insuring title as set forth in the policy.

Although the title insurer and the insured are the only parties to the title insurance policy, the underwriting agreement obligates the underwritten title company to pay a portion of certain title insurance claims. In some circumstances and under some underwriting agreements, the underwritten title company makes such payment directly to the insured party; in others, the title company pays the title insurer.

Under the California insurance tax imposed by article XIII, section 28, of the California Constitution and Revenue and Taxation Code sections 12201 and 12231, the basis of the annual tax on title insurers is all income from business done in this state. During the years in question, the title insurers reported and paid taxes upon that portion of each title insurance premium received from the underwritten title company. They did not report or pay taxes on the portion of the premium that was retained by the underwritten title company or on the value of insurance claims paid by the underwritten title company.

In 1972, the California Department of Insurance (CDI) decided that payments made by an underwritten title company to satisfy its obligation to pay certain portions of policy claims were to be characterized as "income" for purposes of calculating the title insurer's tax burden. In 1973 the CDI began proposing, and defendant State Board of Equalization (the Board)

began issuing, tax assessments on that basis. No known change in statutory law, in the practices of the title insurance industry, in the terms of title insurance policies, or in the contractual relationships between title insurers and underwritten title companies caused the proposal and issuance of these assessments.

## II. PROCEDURAL HISTORY

The Board issued deficiency assessments for various years between 1975 and 1984, which plaintiffs unsuccessfully contested in administrative proceedings before the Board. Plaintiffs then paid the assessments and filed separate actions for refunds. The actions were consolidated in the Superior Court of San Francisco.

The parties stipulated that "[t]he issue in this case concerns whether the amounts of payments made by the underwritten title companies as described in paragraph 4(d) above [relating to underwritten title companies' payment of claims], which were applied to reduce [title insurers'] liabilities under the title insurance contracts, should be included in the 'income' measure for purposes of calculating [title insurers'] tax burdens under the California Insurance Tax." However, shortly before trial, the Board informed the insurers that it would assert a new defense to the insurers' refund claims at trial. The Board claimed that the title insurers should have reported and paid taxes on the total amount of the premiums paid by the insureds, rather than only on the portion they received from the underwritten title companies. After a nonjury trial based on the stipulated facts, the trial court found in favor of the title insurers. In its memorandum opinion, the court held that neither the amount of the claims paid by the underwritten title companies nor the amount of the premiums retained by the title companies was income to the title insurers. A judgment was entered ordering refunds totaling approximately $93,000 plus interest.

The Board appealed the trial court's judgment. The Court of Appeal reversed. The court held that the claims paid by title companies were taxable income to title insurers. The court also held that the total amount of the premium, including that portion retained by the underwritten title company, was taxable to the title insurer. Therefore, the court rejected the title insurers' refund claims. Presiding Justice Anderson dissented, reasoning that the majority should not have reached the question of whether the entire premiums were taxable to the title insurers and that neither the portion of the premiums retained by the title companies nor the amount of the claims paid by the title companies was income to the title insurers.

## III. Taxation of Title Insurers in California

California taxes insurance companies differently than it taxes all other corporations. With some exceptions not relevant to this case, the California Constitution requires insurers to pay an annual tax in lieu of all other state and local taxes. (Cal. Const., art. XIII, § 28, subds. (b), (f); see also Rev. & Tax. Code, §§ 12204, 12231.)

For title insurers, the basis of the annual tax is "all income upon business done in this State, except: [¶] (1) Interest and dividends. [¶] (2) Rents from real property. [¶] (3) Profits from the sale or other disposition of investments. [¶] (4) Income from investments." (Cal. Const., art. XIII, § 28, subd. (c).) Generally, all other insurance companies are taxed on the basis of gross premiums, less return premiums, received upon business done in California. (*Ibid.*)

The annual tax for title insurers is subject only to those deductions specified in article XIII, section 28. (Cal. Const., art. XIII, § 28, subd. (b).) These deductions do not include ordinary and necessary business expenses. Therefore, title insurers cannot deduct from their taxable income amounts paid out on claims. Underwritten title companies, on the other hand, are taxed as corporations and can deduct claims paid as ordinary and necessary business expenses to the extent the expenses are not reimbursed under a separate errors and omissions insurance policy. (See Rev. & Tax. Code, §§ 12001 et seq. & 24343.)

## IV. Are the Claims Paid by the Underwritten Title Companies Income to the Title Insurers?

As noted earlier, all of the underwriting agreements at issue in this case allocate to the underwritten title companies the obligation to pay a portion of certain title insurance claims. The provisions for payment of claims in the underwriting agreements vary; some contemplate that the underwritten title company will pay claims up to a certain sum, while others provide that the underwritten title company will pay some or all of the claims due to its negligence in searching title. Title insurance differs from other insurance in that the preliminary title search is designed to *eliminate* risk by identifying any possible clouds on the title and excluding them from the coverage of the policy. Thus, the obligation of the underwritten title company to pay some portion of claims made under the title policy appears to serve the purpose of increasing the title company's incentive to perform its title search carefully.

Although the title insurers[1] and the Board disagree vigorously on many issues in this case, they do agree that the characterization of any particular payment of a claim as income to the title insurer should not depend on whether the underwritten title company makes the payments directly to the insured or, instead, indirectly through the title insurer. We agree that the distinction between direct and indirect payment of claims has no legal significance. To hold otherwise would exalt form over substance, a practice that courts strive to avoid when interpreting tax law. (See *United States* v. *Hendler* (1938) 303 U.S. 564, 566 [82 L.Ed. 1018, 1019-1020, 58 S.Ct. 655], superseded by statute on other grounds as stated in *Heverly* v. *Commissioner* (3d Cir. 1980) 621 F.2d 1227, 1239; *Burnet* v. *Wells* (1933) 289 U.S. 670, 677 [77 L.Ed. 1439, 1443, 53 S.Ct. 761].)

■ We begin our analysis with a discussion of the meaning of "income," as title insurers are taxed on the basis of "all income upon business done in this State." (Cal. Const., art. XIII, § 28, subd. (c).) Although the constitutional provision and the statutes dealing with taxation of title insurers do not define the term "all income," we may look to our state's definition of "gross income" for guidance. Under California law, "[g]ross income [is] defined by Section 61 of the Internal Revenue Code [26 United States Code section 61]." (Rev. & Tax. Code, § 17071 [definition for purposes of personal income tax]; see also Rev. & Tax. Code, § 24271 [bank and corporation tax law]; and *Spurgeon* v. *Franchise Tax Board* (1984) 160 Cal.App.3d 524, 528 [206 Cal.Rptr. 636] ["the federal and California definitions of 'income' are identical"].) Accordingly, it is appropriate for us to look to federal as well as state authorities for an understanding of the meaning of the term "income." However, our task is to determine whether title insurers realize income for purposes of California *insurance tax law*. In doing so, we must also consider the practical realities of the title insurance business in California.

■ The Board contends that a title insurer realizes income when an underwritten title company pays its share of claims made under title policies. The majority of the Court of Appeal characterized such payments as payments made on behalf of the title insurers in discharge of the *insurers'* debts. In reaching that conclusion, the court emphasized that only the title insurer and the insured are parties to the title policy. The dissent below, on the other hand, correctly noted that a portion of the risk had, in effect, been contractually allocated to the underwritten title company through the underwriting agreement. As the dissent explained, "the insurer has agreed, on an aggregate basis, to take in only 10 percent of all premiums on the assumption that the risk-sharing and actual claims pay out is approximately proportionate. It

[1]For simplicity's sake, we will not specify which insurers have presented which individual arguments.

thus actually receives consideration from the insured commensurate with that portion of the risk which has not contractually shifted to the underwritten title company. The apportionment of premiums cancels the apportionment of liabilities." (Dis. opn. of Anderson, J.) On this basis, the dissent concluded that the underwritten title company's payment of claims did not result in income to the title insurer. As we will discuss, the dissent appears to have reached the correct result.

■ Income has been defined as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion" (*Commissioner* v. *Glenshaw Glass Co.* (1955) 348 U.S. 426, 431 [99 L.Ed. 483, 490, 75 S.Ct. 473]) and as "the accrual of some gain, profit or benefit to the taxpayer." (*Commissioner* v. *Wilcox* (1946) 327 U.S. 404, 407 [90 L.Ed. 752, 754-755, 66 S.Ct. 546, 166 A.L.R. 884], overruled on other grounds in *James* v. *United States* (1961) 366 U.S. 213, 221 [6 L.Ed.2d 246, 254-255, 81 S.Ct. 1052].) Income may be in the form of a direct payment to the taxpayer. Additionally, the discharge of a taxpayer's indebtedness may constitute income to that taxpayer. (See *United States* v. *Hendler, supra*, 303 U.S. at p. 566 [82 L.Ed. at pp. 1019-1020] ["[The taxpayer's] gain was as real and substantial as if the money had been paid it and then paid over by it to its creditors"]; see also *Old Colony Trust Co.* v. *Commissioner* (1929) 279 U.S. 716, 729 [73 L.Ed. 918, 927-928, 49 S.Ct. 499]; *Burnet* v. *Wells, supra*, 289 U.S. at p. 677 [77 L.Ed.2d at p. 1443]; *Diedrich* v. *Commissioner* (1982) 457 U.S. 191, 195 [72 L.Ed.2d 777, 781-782, 102 S.Ct. 2414], superseded by statute as stated in *Davis* v. *Commissioner* (6th Cir. 1984) 746 F.2d 357, 364.) Congress has defined "gross income" as "all income from whatever source derived," including "[i]ncome from discharge of indebtedness." (26 U.S.C. § 61(a)(12).)[2]

Discharge of indebtedness does not constitute taxable income per se; rather, it is "*income* from discharge of indebtedness" that is included within taxable income. (See, e.g., *Commissioner* v. *Rail Joint Co.* (2d Cir. 1932) 61 F.2d 751, 752.) ■ In order to determine whether the title insurers may be taxed on the claims paid by the title companies pursuant to the terms of the underwriting agreements, it is not enough to conclude that the insurers remain ultimately liable to the insured for these amounts. We must also consider whether the title insurers realize *income*, that is, whether the payment of claims results in an accession to wealth.

---

[2]The regulations interpreting this section provide in part that "[t]he discharge of indebtedness, in whole or in part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, the debtor realizes income in the amount of the debt as compensation for his services. A taxpayer may realize income by the payment or purchase of his obligations at less than their face value." (26 C.F.R. § 1.61-12(a).)

The crux of the Board's argument is that the claims paid by the under-written title companies constitute income to the title insurers because only the insurers are liable to the insured. The Board reasons that only the title insurer and the insured, not the underwritten title company, are parties to the title insurance contract, and that only the title insurer is authorized to issue title insurance policies under California law. Therefore, in the Board's view, obligations arising under the policy are the insurer's debts and the insurer realizes income when the underwritten title company either pays the insured directly or reimburses the insurer for claims made under the policy.

However, in reality the answer is not as simple as the Board's argument suggests. The title insurer and the title company, through the underwriting agreement, have agreed to allocate the labor, risk, liability, and premium involved in the preparation and issuance of a contract of title insurance. The underwriting agreement is an arm's-length contract; each party has presumably agreed that the values of the performances are equal, and each has promised consideration in return for the other's promised performance. Under the agreement, the underwritten title company retains a portion of the premiums and undertakes certain obligations, among them searching title and paying a share of certain claims arising under the policy. The title insurer forgoes the portion of the premium attributable to the portion of the risk that is allocated to the underwritten title company. Nevertheless, the insurer remains liable to the insured and must pay the full amount of the claims if the underwritten title company fails to perform in accordance with its obligation under the underwriting agreement.

The Board argues that an arrangement by which the insurer and the underwritten title company allocate the risks between them would make the underwriting agreement an illegal contract of insurance. California law forbids anyone to transact any class of insurance business without first being admitted by the Insurance Commissioner to such class. (Ins. Code, § 700.[3]) The parties have stipulated that the underwritten title companies are not licensed or authorized to carry on the business of insurance in California.

However, even if the underwriting agreements serve a risk-shifting function, we need not conclude that they are illegal insurance contracts. Insurance is defined as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (§ 22.) Case law has interpreted this statute as requiring two elements: "(1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly

---

[3]All further statutory references are to the California Insurance Code unless otherwise noted.

situated persons. [Citations.]" (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization* (1982) 32 Cal.3d 649, 654 [186 Cal.Rptr. 578, 652 P.2d 426].)

■ The underwriting agreement does not appear to be a contract of insurance for two reasons. First, it does not appear to distribute the risk of liability for claims among similarly situated persons. Under the contract, the underwritten title company agrees to indemnify the insurer for a portion of its liability. There is no indication that the underwriting agreements distribute the risk among similarly situated title insurers.

■ Second, "the mere fact that a contract contains these two elements [shifting and distribution of risk of loss] does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation." (*Truta* v. *Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 812 [238 Cal.Rptr. 806] [*Truta*].) Rather than simply look to whether the contract involves an assumption of a risk, we will instead ask " 'whether that [assumption of risk] or something else to which it is related in the particular plan is its principal object and purpose.' " (*Transportation Guar. Co.* v. *Jellins* (1946) 29 Cal.2d 242, 249 [174 P.2d 625] [*Jellins*]; see also 12 Appleman, Insurance Law and Practice (1981) § 7002, p. 14.)

Following this reasoning, California courts have held that arrangements similar to those in this case were not illegal contracts of insurance. For instance, a car rental agreement containing an element of insurance was not an illegal contract of insurance because the insurance element was peripheral to the main purpose of the contract. (*Truta, supra,* 193 Cal.App.3d at p. 814.) Likewise, a truck maintenance contract in which the contractor agreed to insure the vehicles for the owner with an authorized insurance company was held to be not an illegal contract because the main purpose of the contract was to supply labor. (*Jellins, supra,* 29 Cal.2d at pp. 249, 252-253.) Further, a medical services corporation that provided medical services to low-income patients who paid monthly membership dues did not engage in the business of insurance illegally, because the principal purpose or object of the operation was service rather than indemnity. (*California Physicians' Service* v. *Garrison* (1946) 28 Cal.2d 790, 809-810 [172 P.2d 4, 167 A.L.R. 306].)

■ Based on this analysis, we conclude that the underwriting agreements are not illegal contracts of insurance. Their main function is not to require the underwritten title company to provide insurance, either to the title insurer or to the insured, but instead to require the underwritten title company to perform a title search and examination carefully and diligently as well as to carry out the formalities involved in the issuance of a title insurance policy. The indemnification provisions are secondary to the main

object and purpose of the underwriting agreements. In fact, the agreements to indemnify appear to be designed, at least in part, to give the underwritten title companies an incentive to perform their title search in a nonnegligent manner, as the title companies are in the best position to eliminate possible risk. Therefore, the title company is not involved in the illegal practice of insurance even if an underwritten title company is deemed to have provided indemnification in connection with the main purpose of its contract with the title insurer.

■ The parties have been unable to direct us to any case closely analogous to the one before us. However, none of the cases cited by the parties lead us to conclude that the title insurers realize income in the amount of the claims paid by the title companies. The Board asserts that we should follow cases holding that payments in discharge of legal obligations under a contract are income. (See, e.g., *Robertson* v. *United States* (1952) 343 U.S. 711, 713 [96 L.Ed. 1237, 1240, 72 S.Ct. 994] [*Robertson*].) However, the cases relied on by the Board for this proposition are clearly distinguishable.

The Board cites *Diedrich* v. *Commissioner, supra,* 457 U.S. 191, 196-198 [72 L.Ed.2d 777, 782-784], which involved a gift structured so that the donee paid the gift tax rather than the donor. The court treated the transaction as a partial sale and held that the gift tax was income to the donor to the extent that the tax exceeded the donor's adjusted basis in the property. Similarly, in *Old Colony Trust Co.* v. *Commissioner, supra,* 279 U.S. 716, the court held that an employee realized income when his employer paid his income tax. (*Id.* at p. 729 [73 L.Ed. at pp. 927-928].) The court stated that the payments were in consideration of services rendered by the employee and constituted gain derived by the employee for labor. (*Ibid.*) The form of the payment made no difference. (*Ibid.*) Likewise, in *United States* v. *Boston & Maine Railroad Co.* (1929) 279 U.S. 732 [73 L.Ed. 929, 49 S.Ct. 505], a lessee agreed to pay taxes as part of a lease agreement. The court held that these taxes constituted income to the lessor. (*Id.* at pp. 734-736 [73 L.Ed. at pp. 930-931].) In each of these cases, the taxpayer realized a gain by being relieved of a tax obligation for which the taxpayer alone was liable. Such is not the case here, where the insurers and the title companies contracted in advance to divide the premium, labor, risk, and liability between themselves. The economic reality of the transaction is that the title insurer forgoes a portion of the premium and the underwritten title company receives that portion in return for its allocated share of the risk and liability. There is no

gain to the title insurer when the title company performs its obligations under the underwriting contract.[4]

The Board also relies on *Burnet* v. *Wells, supra,* 289 U.S. 670, and *Robertson, supra,* 343 U.S. 711. Although these cases shed light on the concept of income, neither is applicable to the case at hand. *Burnet* v. *Wells* held that the proceeds of a trust for the payment of insurance premiums constituted taxable income to the settlor, as provided by statute. (*Burnet* v. *Wells, supra,* 289 U.S. at pp. 677, 680-681 [77 L.Ed. at pp. 1445-1446].) In *Robertson,* a composer won a prize for musical composition. The court held that the prize was income taxable to the composer, as it was compensation for his labor. (*Robertson, supra,* 343 U.S. at pp. 713-714 [96 L.Ed. at pp. 1240-1241].) Again, these cases do not consider a situation in which the taxpayer has reached an arm's length agreement in advance with a third party by which that third party assumes certain risks in return for a consideration that reflects the value of those risks.[5] The Board would have us conclude that the discharge of indebtedness pursuant to a contract always constitutes income to the obligor. However, we must look to the substance of the transaction to determine whether the taxpayer actually realizes gain when the third party fulfills its obligations under the contract. Under the facts of this case, we cannot conclude that the claims paid by the underwritten title company constitute gains on the part of the title insurer.

To summarize, from the outset the title insurer and the underwritten title company have divided the labor, risk, liability, and premiums between them. The title insurer takes in only that portion of the premium that compensates it for the risk that has not been contractually allocated to the underwritten title company. When the underwritten title company fulfills its obligation to the insurer by paying its portion of the claims, the insurer does not realize any additional gain. Since there is no gain, it follows that there is no income.

---

[4]This case is also distinguishable from *Tennessee Securities, Inc.* v. *C.I.R.* (6th Cir. 1982) 674 F.2d 570. In that case, two brothers personally guaranteed a loan made to a franchise corporation. When the corporation defaulted, the brothers' own closely held corporation paid the debt to the lender. The Sixth Circuit Court of Appeals held that, because the brothers received consideration for their creation of indebtedness, they realized income when that obligation was extinguished by their closely held corporation. (*Id.* at p. 574 [distinguishing *Bradford* v. *Commissioner* (6th Cir. 1956) 233 F.2d 935, in which the debtor did not assume the risk in an arm's length commercial transaction and received no consideration for the creation of the indebtedness and, therefore, received no income from the debt's extinguishment].) In contrast, in the case before us the title insurer and the underwritten title company agreed at the outset to divide the premium, presumably in proportion to the amount of risk that each assumed and the amount of work that each performed.

[5]As noted earlier, the underwritten title company is in the best position to eliminate the risk of insurable defects in the title through a careful title search. Apportioning some liability to the underwritten title company appears to serve the purpose of minimizing the claims that will arise under the title insurance policies.

Therefore, we hold that title insurers may not be taxed on the amount of the claims paid by the underwritten title companies.

## V.   IS THE ISSUE OF WHETHER THE ENTIRE PREMIUMS ARE TAXABLE TO THE TITLE INSURERS PROPERLY BEFORE THE COURT?

The title insurers brought this action seeking a refund of taxes assessed and paid on the claims that the underwritten title companies paid pursuant to the underwriting agreements. The Board argues that, even if its position on the claims issue is incorrect, any possible refund is offset by the fact that the insurers should have paid taxes on the full amount of the premiums received by the underwritten title companies, rather than only on the portion passed on to them by the title companies. The Board did not raise this issue in either the administrative proceedings or in its pleadings in the consolidated action. Rather, it mentioned the issue for the first time shortly before trial, when the Board's counsel informed the insurers' counsel in a telephone conversation that the Board intended to rely on the issue at trial. This conversation appears to have taken place during the time the stipulated facts were being prepared.

The insurers argue that the Board could not properly raise an issue in the superior court that was not raised previously in the administrative proceedings. Alternatively, the insurers argue that, even if it was proper for the Board to raise the issue for the first time in the court action, the Board was required to plead the issue as a setoff in its answer by way of an affirmative defense. Finally, the insurers contend that the Board waived the issue when it agreed in the stipulated facts that the issue in the case concerned whether the claims paid by the underwritten title companies were taxable as income to the insurers.[6]

The insurers assert that the superior court lacked jurisdiction to rule on the premiums issue since the Board failed to raise this issue in the administrative proceedings. While it is evident that the taxpayer is limited to those claims

[6]The Board argues that we should not consider whether it failed to raise the defense properly because the insurers did not make such an argument in the Court of Appeal. (See Cal. Rules of Court, rule 29(b)(1).) However, it is appropriate for us to consider the procedural issue now. The insurers argued in their trial brief that their tax liability on the full amount of the premiums was not an issue in the case, and stated in their briefs before the Court of Appeal that the stipulation of facts contained no facts on which the court could apply the setoff. Additionally, the dissenting justice in the Court of Appeal discussed the issue, reasoning that a reviewing court has authority to limit the scope of appeal to matters properly before it, regardless of whether the litigants so advocate. Therefore, we will consider whether the issue was properly raised. (See *Schroeder* v. *Auto Driveway Co.* (1974) 11 Cal.3d 908, 918-919, fn. 7 [114 Cal.Rptr. 622, 523 P.2d 662]; and *Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 532, fn. 9 [35 Cal.Rptr. 241, 386 P.2d 817].)

pursued in the administrative proceedings (see Rev. & Tax. Code, §§ 13102-13104), the issue of whether similar limits apply to the Board has not been previously addressed. The Board must follow certain administrative procedures when charging the taxpayer with deficiencies. These procedures are delineated in Revenue and Taxation Code sections 12421 through 12435. Under these sections, the commissioner must determine any deficiencies in the taxpayer's return and propose in writing to the Board a deficiency assessment for the difference. (Rev. & Tax. Code, § 12422.) The Board must then make a deficiency assessment on the basis of the proposal submitted by the commissioner. (Rev. & Tax. Code, § 12424.) The code then provides for prompt notice to the taxpayer of any deficiency assessment. (Rev. & Tax. Code, § 12427.) These procedures allow the taxpayer against whom a deficiency assessment is made to petition for redetermination within 30 days after notice—if no petition for redetermination is filed within 30 days, the deficiency assessment becomes final and due and payable. (Rev. & Tax. Code, § 12428.) The taxpayer is entitled to an oral hearing for the presentation of evidence and argument before the Board or its authorized representative. (Rev. & Tax. Code, § 12429.) After the order or decision of the Board upon the petition for redetermination becomes final and the resulting deficiency assessment becomes due and payable (see Rev. & Tax. Code, § 12431), the taxpayer may file an action in the superior court for a refund or credit pursuant to sections 13102 through 13108 of the Revenue and Taxation Code.

By claiming that the title insurers should not receive a refund because they should have paid taxes on the total premiums paid by their insureds to the title companies, the Board is essentially assessing a deficiency against the title insurers. However, the Board is charging such a deficiency without following the above mentioned statutorily required administrative procedures.    ▪    Just as the taxpayer is limited to the claims it may assert in the superior court to those pursued in the administrative proceedings, the Board should be limited in its assertion of setoffs in the superior court action to those deficiency assessments formally pursued under Revenue and Taxation Code sections 12421 through 12435: " 'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens." (Annot., Estoppel of State or Local Government in Tax Matters (1983) 21 A.L.R.4th 573, 658, citing Comment, *Hobson's Choice and Similar Practices in Federal Taxation* (1935) 48 Harv. L.Rev. 1281, internal quotations omitted.)    ▪    Because the deficiency assessments in this case were based not on the premiums issue but on the theory that the insurers realize income from discharge of indebtedness when underwritten title companies contribute to payment of claims, we conclude that the premiums issue was not properly before the superior court.

Even if we were to determine that the Board was not limited to the issues raised in the administrative proceedings, the Board was required to raise the premiums issue in its answer in the superior court action. A setoff is generally a new matter which must be affirmatively pleaded. (See, e.g., *Smith* v. *Norman I. Fadel, Inc.* (1963) 215 Cal.App.2d 13, 16 [29 Cal.Rptr. 839]; *Carranza* v. *Noroian* (1966) 240 Cal.App.2d 481, 488 [49 Cal.Rptr. 629].) The Board argues, however, that the rule requiring setoffs to be affirmatively pleaded does not apply in this case because the insurers had the burden of proving that they were entitled to a refund. (See *United States* v. *Janis* (1976) 428 U.S. 433, 440 [49 L.Ed.2d 1046, 1052-1053, 96 S.Ct. 3021]; *Jimmy Swaggart Ministries* v. *State Bd. of Equalization* (1988) 204 Cal.App.3d 1269, 1276 [250 Cal.Rptr. 891], affd. 493 U.S. 378 (1990) [107 L.Ed.2d 796, 110 S.Ct. 688].) The Board contends that, rather than requiring it to plead the defense affirmatively, we should treat this action as in the nature of an action for "money had and received" (*Lewis* v. *Reynolds* (1932) 284 U.S. 281, 283 [76 L.Ed. 293, 294-295, 52 S.Ct. 145], mod. *Lewis* v. *Reynolds* (1932) 284 U.S. 599 [76 L.Ed. 514, 52 S.Ct. 264]) and apply the pleading rules applicable to common counts. (See *Interstate Group Administrators, Inc.* v. *Cravens, Dargan & Co.* (1985) 174 Cal.App.3d 700, 706-709, and fn. 2 [220 Cal.Rptr. 250].)

■ "The common count is a general pleading which seeks recovery of money without specifying the nature of the claim . . . . Because of the uninformative character of the complaint, it has been held that the typical answer, a *general denial*, is sufficient to raise almost any kind of defense, including some which ordinarily require special pleading. [Citations.]" (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 998, p. 422, italics in original; see also *Interstate Group Administrators, Inc.* v. *Cravens, Dargan & Co., supra,* 174 Cal.App.3d at p. 706.) However, even where the plaintiff has pleaded in the form of a common count, the defendant must raise in the answer any new matter, that is, anything he or she relies on that is not put in issue by the plaintiff.[7] (*Interstate Group Administrators, supra,* 174 Cal.App.3d at pp. 706-707; *Carranza* v. *Noroian, supra,* 240 Cal.App.2d 481, 484-486, 488.)

■ The Board's attempts to analogize the pleadings required in response to the insurers' pleadings to those required in response to a complaint in the form of a common count are not persuasive. The argument ignores the

[7]The Board argues that the insurers impliedly raised the premium issue when they stipulated to the "agency" relationship. We reject this argument, as the insurers merely stipulated to an agency relationship with respect to preparing and issuing the title insurance policies, determining the premiums and collecting the premiums. While these are some of the functions the underwritten title companies perform, the title companies also perform title searches and title examinations and prepare preliminary title reports.

fact that the insurers did not plead in the form of a common count. Thus, their complaints did not have the " 'uninformative character' " of a common count. (See *Interstate Group Administrators, Inc.* v. *Cravens, Dargan & Co., supra,* 174 Cal.App.3d at p. 706.) The complaints made the Board aware of the precise nature of the insurers' claims; indeed, the Board was aware that the insurers could only bring their refund action on the grounds set forth in their administrative claims. (See Rev. & Tax. Code, §§ 13103 and 13104.) Therefore, the Board derives no benefit from cases holding that a general denial in response to a common count raises defenses that are otherwise required to be affirmatively pleaded.

To accept the Board's position would place an unacceptable burden on taxpayers seeking refunds. As the Board notes, a refund case throws open the taxpayer's entire tax liability for the period in question (*State Bd. of Equalization* v. *Superior Court* (1985) 39 Cal.3d 633, 641-642 [217 Cal.Rptr. 238, 703 P.2d 1131]), and the Board may raise issues unrelated to the basis or theory on which the taxpayer is seeking a refund in order to defeat the claim. (See *Owens-Corning Fiberglas Corp.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 532, 535-536 [114 Cal.Rptr. 515].) If the Board is not required to plead its defenses to refund claims, taxpayers would be forced to prepare for trial and conduct discovery in ignorance of any possible setoffs or defenses the state might assert. Taxpayers cannot prepare for unknown attacks on their refund claims. The burden would be particularly severe in a case such as this, in which the Board is seeking a setoff based on the taxability of the full premium, which it had never treated as income in the past, and which the insurers could not have expected to be at issue in the case.[8]

The insurers' complaints in superior court alleged facts relating to the taxation of the payment on claims made by the underwritten title companies, but did not allege facts relating to the portion of the premium fees that the underwritten title companies passed on to them or whether they paid taxes on such fees. The Board's answers did not allege that the insurers failed to pay taxes on the full amount of the premiums or that this underpayment of taxes would offset or defeat the refund claim. Nor did the Board provide specific information that would allow a court to determine whether the alleged underpayment of taxes on the premiums would in fact offset the entire amount of any refund of taxes paid on the claims payments. In sum,

[8]Although the record on this issue is far from complete, the limited evidence that we have before us indicates that title insurers have historically reported and paid taxes on only the portion of the premiums that were passed on to them. In the past, the Board has apparently not taxed the premiums retained by underwritten title companies, and it is not clear that the Board is currently assessing such a tax.

the Board did not raise the issue of the insurers' duty to report the full premium amounts as income.[9]

Moreover, the Board stipulated before trial that "the issue" in the case "concern[ed]" whether the insurers received income from the claims paid by the underwritten title companies. ■■ A court will respect a stipulation limiting the issues in a case. (*Vitale* v. *City of Los Angeles* (1936) 13 Cal.App.2d 704, 706 [57 P.2d 993].) ■■ The Board suggests that the stipulation meant that the issue in the case *concerned*, but was not *limited to*, that issue, and that it remained free to raise other issues to defeat the refund claim. We cannot accept this strained reading of the stipulation. A plain reading suggests, rather, that the parties had agreed to limit the issues presented to the trial court and had waived all other issues. The Board should not be permitted to escape the effects of its stipulation.

Therefore, because the Board failed to issue a deficiency assessment on the premiums issue, failed to raise the setoff defense in its pleadings, and because the Board agreed to limit the issues in the case, the issue of whether the entire premium amounts can be taxed as the insurers' income was never properly before the superior court.

## VI. CONCLUSION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Dissenting.—The question presented in this case is whether a title insurance company (insurer) that issues a policy of title insurance receives taxable income when an underwritten title company with which the insurer has a separate contractual arrangement pays a claim against the insurer by a policyholder on behalf of the insurer, or compensates the insurer for a claim that the insurer has paid. Looking beyond form to substance, I would hold that under these circumstances the insurer has received income, and is therefore subject to taxation under the California Constitution. Accordingly, I respectfully dissent.

## BACKGROUND

The seven plaintiff insurers each issue policies through underwritten title companies that act as their agents. The relationships between the insurers

---

[9]The Board also argues that it gave the insurers adequate notice that it intended to argue the setoff when it told counsel for the insurers of its intent in a telephone conversation while the stipulation of facts was being prepared. However, a telephone conversation cannot take the place of proper pleading.

and the title companies are set forth in separate underwriting agreements that are concededly not policies of insurance. Under these agreements, the title companies conduct title searches, prepare title reports, issue the title insurance policies to the policyholders using forms prepared by the insurers, determine the premiums from schedules supplied by the insurers, and collect premiums. The underwriting agreements between the title companies and the insurers also provide that the title companies retain about 90 percent of the premiums, and pay the remainder to the insurers. The policyholders are not parties to the underwriting agreements.

According to the underwriting agreements, when a policyholder makes a claim under a title insurance policy one of two procedures is followed. Under the procedure set forth in four of the seven underwriting agreements at issue here, the insurer pays the claim directly. Then the title company compensates the insurer for the amount of the claim the insurer has just paid its policyholder, up to a specified limit. Under the alternative procedure set forth in the remaining three underwriting agreements, when a claim is made by a policyholder, the title company pays the policyholder's claim directly up to the specified amount, and the excess of the claim over the limit, if any, is then paid by the insurer.

The insurers here did not report as income or pay taxes on the payments made to them by the title companies to pay claims they had paid to the policyholders, nor on the claims that were paid by the title companies to the policyholders on behalf of the insurers. The Board of Equalization issued deficiency assessments against the insurers for certain years between 1975 and 1984, on the ground that the payments to the insurers by the title companies to compensate the insurers for claims the insurers had paid and the payments made directly to the policyholders by the title companies on behalf of the insurers were income to the insurers on which taxes must be paid. The insurers unsuccessfully contested those assessments in administrative proceedings, and then the insurers paid the claims and sued for refunds. The trial court found in favor of the insurers, but the Court of Appeal reversed the judgment.

DISCUSSION

Under article XIII, section 28, subdivision (c) of the California Constitution, title insurers must pay a tax on "all income upon business done in this state." Subject to certain exceptions not applicable here, this tax is "in lieu of all other taxes and licenses, state, county, and municipal, upon such insurers and their property." (Cal. Const., art. XIII, § 28, subd. (f).) In place of these other taxes, title insurers are taxed at an annual rate of 2.35 percent on "all

income." (Cal. Const., art. XIII, § 28, subd. (d).) Section 28 does not define the phrase "all income." The parties in this case, however, agree that the federal income tax concept of "gross income" is analogous. Indeed, Congress in defining "gross income" used the phrase "all income." "Gross income," under federal law, "means all income from whatever source derived . . . ." (26 U.S.C. § 61(a).)

Under the precedents of the United States Supreme Court, the concept of "income" is broad. It has been described as encompassing all "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion" (*Commissioner* v. *Glenshaw Glass Co.* (1955) 348 U.S. 426, 431 [99 L.Ed. 483, 490, 75 S.Ct. 473]; accord, e.g., *Commissioner* v. *Kowalski* (1977) 434 U.S. 77, 83 [54 L.Ed.2d 252, 259, 98 S.Ct. 315]), and, more recently, simply as "any 'accessio[n] to wealth' " (*United States* v. *Burke* (1992) 504 U.S. __, __ [119 L.Ed.2d 34, 42-43, 112 S.Ct. 1867, 1870]). The high court has emphasized that the statutory language indicates an intent to include all sources of income to the fullest extent of constitutional taxing power. (*Ibid.*; *Commissioner* v. *Kowalski, supra*, 434 U.S. at p. 82 [54 L.Ed.2d at pp. 258-259].)

The labels parties attach to their transactions do not determine whether there is income. The high court "has recognized that 'income' may be realized by a variety of indirect means. . . . [T]he substance, not the form, of the agreed transactions controls." (*Diedrich* v. *Commissioner* (1982) 457 U.S. 191, 195 [72 L.Ed.2d 777, 781, 102 S.Ct. 2414].) This court has also stressed that the judicial task is "to look beyond the formal labels the parties have affixed to their transactions and seek . . . to discern the true economic substance of the . . . arrangement." (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization* (1982) 32 Cal.3d 649, 656-657 [186 Cal.Rptr. 578, 652 P.2d 426].)

1. *Are the title companies' payments to the insurers to compensate the insurers for claims the insurers have paid "income" to the insurers?*

The first question is whether the payments made by the title companies to the insurers to compensate the insurers are "income" to the insurers. In my view, when an insurer receives a payment from a title company, the insurer has received income within the meaning of the broad statutory concept "all income."

The insurers in their briefs treat the underlying transactions as if they were of labyrinthine complexity. They are not. What happens is this: A policyholder makes a claim under a title insurance policy. The insurer pays the

claim. The title company then compensates the insurer for the total amount the insurer has just paid to the policyholder, up to the limit specified in the contract between the title company and the policyholder.

There is no difference between payment or compensation received by an insurer when a title company pays it money under a contract and payment or compensation received by any business under a contract with any other business. Both are income. The payment the insurer receives is not a gift. It is consideration for services rendered. The insurer has provided a service to the title company—it has made insurance for the title company's title services available, and the title company benefits from this because it is then able to sell its services (searching title, etc.) in a package with insurance to the customer, who is the policyholder. In return for this service that the insurer provides to the title company, the title company assumes certain obligations. Among them is the obligation to compensate insurers for the claims insurers pay.

In any other business context, there would be no question that payment for services rendered is included within gross income. Indeed, under 26 United States Code section 61(a)(2), "gross income derived from business" is specifically included within "gross income," which, as noted, is itself within "all income."

The insurers contend that they receive no income when the title companies pay them for claims the insurers have paid. This contention might have merit if the insurers could somehow demonstrate that even though they had been paid, they received no "accession to wealth." But they cannot do so. The Board of Equalization correctly points out in its brief that, as far as the record in this litigation shows, when an insurer pays a claim and then receives money from a title company, the money it receives is completely unrestricted. From the insurer's point of view, all dealings with the insurance policy are over when it pays the claim. The later payment from the title company to the insurer is made under a separate business contract between the insurer and the title company, and the payment received makes the insurer that much "wealthier" than it would have been had the payment never been made. The payment may be used for salaries to executives or dividends to shareholders, or for any other legal purpose. The insurer has "complete dominion" over such funds. It defies logic to suggest that when an insurer receives money from a title company with which it has a business relationship, its wealth is not thereby increased.

Several of the plaintiff insurers suggest that the funds they receive from the title companies when they have paid claims are not "income" because

those funds offset the claims the insurers have paid out to the policyholders. This argument, however, confuses the concept of "income" with that of "profit." Profit is, of course, what remains after the expenses of doing business are deducted from the funds an enterprise receives. (See *Nofziger* v. *Holman* (1964) 61 Cal.2d 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696].) California law distinguishes between income and profit in the taxation of insurers. For example, ocean marine insurers are not taxed on "all income," as are title insurers; instead, they are taxed on their "underwriting profit" (Cal. Const., art. XIII, § 28, subd. (g)), which is measured in part by deducting losses paid out in claims (Rev. & Tax. Code, § 12073). If the drafters of section 28 intended that title insurers could deduct losses paid out in claims from the amount on which they were taxed, article XIII, section 28 would have used the concept of "profit" rather than the broad phrase "all income" in defining the sums on which title insurers are taxed.

Therefore, as a matter of economic reality, when an insurer receives money from a title company under a contractual arrangement requiring the title company to compensate the insurer for claims the insurer has paid, the insurer receives income. Under article XIII, section 28 of the California Constitution, that income is taxable at a rate of 2.35 percent per year.

*2. Are the title companies' direct payments to policyholders to discharge the obligations of the insurers "income" to the insurers?*

As noted above, there is an alternative procedure set forth in three of the underwriting agreements at issue here. Under that procedure, when a claim is made by a policyholder, the title company, rather than compensating the insurer for the claims it has paid, simply pays the policyholder's claim directly. In my view, this procedure also results in income to the insurer.

The conclusion that this alternate procedure produces income to the insurer is supported by both logic and case law. The case law is clear that substance, not form, determines whether a transaction gives rise to income. (*Diedrich* v. *Commissioner, supra*, 457 U.S. at p. 195 [72 L.Ed.2d at pp. 781-782]; *Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra*, 32 Cal.3d at pp. 656-657.) Here, the distinction between the contracts specifying that the insurers pay the claims directly and then seek compensation from the title companies, and the contracts that specify that the title companies pay the claims in the first instance, is one of form and not substance. If, as I have shown, contracts of the first type produce income to the insurers, then surely contracts of the second type do as well.

Moreover, the conclusion that when a title company pays a claim on behalf of an insurer the insurer has received income is also compelled by the

rule governing discharge of indebtedness. Under that rule, the "discharge of liability by the [third party's] payment of the [first party's] indebtedness constitute[s] income to the [first party] and is to be treated as such." (*United States* v. *Hendler* (1938) 303 U.S. 564, 566 [82 L.Ed. 1018, 1019-1020, 58 S.Ct. 655]; accord, e.g., *Diedrich* v. *Commissioner, supra,* 457 U.S. at p. 195 [72 L.Ed.2d at pp. 781-782].) An illustration of this principle is found in *Old Colony Trust Co.* v. *Comm'r Int. Rev.* (1929) 279 U.S. 716 [73 L.Ed. 918, 49 S.Ct. 499]. There, an employer agreed to pay an employee's income taxes. The high court held that payment of the employee's income tax indebtedness was income to the employee. (*Id.* at p. 729 [73 L.Ed. at pp. 927-928].)

This case is in substance no different. The insurer is legally obliged to pay all valid claims under its insurance policies. When a title company steps in and pays a policy claim on behalf of the insurer, it discharges a debt of the insurer. Accordingly, this discharge constitutes income to the insurer, and is to be treated as such.

The majority attempts to distinguish *Old Colony Trust Co.* v. *Comm'r Int. Rev., supra,* 279 U.S. 716; *Diedrich* v. *Commissioner, supra,* 457 U.S. 191; and *United States* v. *Boston & M. R. Co.* (1929) 279 U.S. 732 [73 L.Ed. 929, 49 S.Ct. 505]. It writes that "[i]n each of these cases, the taxpayer realized a gain by being relieved of a tax obligation for which the taxpayer alone was liable. Such is not the case here, where the insurers and the title companies contracted in advance to divide the premium, labor, risk and liability between themselves." (Maj. opn. *ante,* at p. 727.) According to the majority, this case presents "a situation in which the taxpayer has reached an arm's-length agreement in advance with a third party by which that third party assumes certain risks in return for a consideration that reflects the value of those risks." (*Id.* at p. 728.) The factor of risk assumption by the title companies somehow, in the majority's view, means that when the title companies pay claims on behalf of the insurers, the discharge of the insurers' indebtedness is not income to the insurers.

The majority's reasoning is defective, for two reasons.

First, it proves too much. An allocation of risk between contracting parties is certainly not unique to the insurer-title company relationship. Indeed, one court has stated that "[a]ll commerce and all contracts allocate risks and benefits." (*Valley Bank of Nevada* v. *Plus System, Inc.* (9th Cir. 1990) 914 F.2d 1186, 1190.) To use a simple example, a private investor lends money to a manufacturer at a specified rate of interest for a fixed term. The loan contract by its nature allocates risks and benefits; the manufacturer bears the risk, among others, that deflation will occur and it will thereby be more

costly, in real economic terms, to repay the loan. When the manufacturer repays the loan to the investor, we do not say that, because the manufacturer has borne the risk that the value of money will increase, the money it pays to the investor does not result in income to the investor. Similarly, the mere fact that the title company may assume some quantum of risk cannot mean that the money it pays to the insurer does not result in income to the insurer.[1]

Second, the majority's reasoning ignores the fact that the insurers, not the title companies, are primarily and ultimately liable to the policyholders for the payment of claims. The insurer is the obligor under the insurance contract; the title company is not even a party to the contract. And the insurer remains ultimately liable under the policy. This is an indisputable proposition of law. A title insurance policy is a contract that insures the owner of property or another interested party against defects in title or liens and encumbrances that affect title, the invalidity of liens or encumbrances, or the incorrectness of title searches. (Ins. Code, §§ 12340.1, 12340.2.) Under California law, the function of title insurance can only be performed by an admitted insurer that had been issued a certificate of authority by the Insurance Commissioner to transact title insurance. (Ins. Code, §§ 700, 12360.) The functions of a title company are also precisely delineated by statute, and a title company has no statutory authority to become a party to a contract of title insurance. (Ins. Code, §§ 12340.5, 12389.) To the extent that a title company has any role in the title insurance function, it can only be as an agent of an admitted title insurer. Indeed, the stipulation executed

[1]If, as the majority asserts, the transfer of risk in a contractual context somehow negates the receipt of income, one wonders how the majority would respond to the following scenario:

A corporation employs an attorney. As part of the attorney's compensation package, the corporation agrees to make all monthly payments due on an adjustable rate mortgage on the attorney's residence. Thus, the corporation contractually agrees to allocate to itself the risk that the mortgage rate will rise during the life of the contract. On the basis of her reading of the majority opinion in this case, the attorney does not report as income on her California tax return any of the payments on her adjustable rate mortgage made by her employer. The Board of Equalization then issues a deficiency assessment against her for taxes due on the theory that the mortgage payments constitute income.

The attorney pays the tax under protest and sues for a refund. What result? Certainly, under the logic of the majority's position, there can be no principled distinction between the insurers here and the attorney in this scenario. Just as in this case, the factors the majority identifies as dispositive to its conclusion of no income are present; both are "situation[s] in which the [party seeking to avoid taxes] has reached an arm's length agreement in advance with a third party by which that third party assumes certain risks in return for a consideration that reflects the value of those risks." (Maj. opn, *ante*, at p. 728.)

If there is no principled way to distinguish the insurers' claim to tax exemption in this case from the attorney's claim in this scenario, then the majority has created a "tax loophole" of potentially immense proportions. No doubt many highly compensated persons will wish to take advantage of the majority's beneficence to have their employers transfer income to them free of state income taxes in the form of agreements to pay adjustable rate mortgages and variable interest rate credit card balances.

by all the parties in this case, and the underwriting agreements between the insurers and the title companies on which that stipulation is based, all specifically refer to the title companies as agents of the insurers.

Because title companies can, as a matter of law, assume none of the functions of title insurers, but can only act as the agents of such insurers, the conclusion is unavoidable that title companies cannot ultimately assume any portion of the risk that a claim will be made, and that the title companies are mere conduits for claims payments for which the insurers remain primarily and ultimately liable. And because the title companies cannot be ultimately responsible for payment of any claims made under the insurers' policies, it follows that, even under the majority's reasoning that the allocation of risk can defeat the conclusion that income was received, the insurers transferred no risk and thus cannot escape the conclusion that they received income when the title companies paid claims on their behalf.

## CONCLUSION

Title insurance exists to compensate policyholders for losses resulting from what may be described broadly as title defects. Although insurers that issue policies of title insurance are in the business of compensating these losses, the majority holds that when an insurer enters into an underwriting agreement with a title company under which the title company assumes the burden of paying policy claims—either directly to the policyholder or by way of offset to the insurer—these payments are not income to the insurer. The theory appears to be that when the title insurance policy and the underwriting agreement are read together, the insurer can be viewed as a mere passive intermediary or conduit of funds flowing from the title company to the policyholder to discharge the insurer's liabilities under the policy. This theory is based on the supposition that the insurer has transferred the risk against which insurance is purchased from itself to the title company. But, as I have explained, the insurer's role in paying policy losses is neither as slight nor as passive as the majority suggests. Ultimately, the insurer cannot transfer the risk against which the policyholder has purchased insurance to a title company or to any other third party that is not an admitted insurer. And the transfer of risk itself cannot transform a taxable receipt of income into the receipt of funds without tax consequences.

I would conclude that when a title company pays a claim on behalf of an insurer or pays the insurer directly to compensate it for a claim it has paid, the economic reality is that the insurer has received a gain; thus, the insurer

has received income, and is subject to taxation under article XIII, section 28 of the California Constitution.[2]

I would affirm the judgment of the Court of Appeal.

Mosk, J., concurred.

Respondent's petition for a rehearing was denied March 18, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[2]Because I conclude that the claims payments are income to the insurers, I also conclude that the insurers are not entitled to a refund. I therefore find it unnecessary to consider whether any possible refund would be subject to an offset, or whether the Board of Equalization properly preserved the offset issue in administrative proceedings.