991 P.2d 120 (2000)
98 Wash.App. 882
FIRST AMERICAN TITLE INSURANCE COMPANY, Appellant,
v.
STATE of Washington DEPARTMENT OF REVENUE, Respondent.
No. 23420-3-II.
Court of Appeals of Washington, Division 2.
January 14, 2000.
*121 John Gerhart Hennen, Atty. Gen. Revenue Div., Olympia, for Respondent.
George C. Mastrodonato, Michael B. King, Kathleen D. Benedict, Lane Powell Spears Lubersky, Olympia, for Appellant.
Camden Michael Hall, Foster, Pepper and Shefelman, Pllc, Seattle, for amicus curiae Washington Land Title Assoc.
MORGAN, J.
The question in this case is whether a title insurer must pay business and occupation (B & O) tax on the entire premium a customer pays, or only on the part related to insurance. The answer is the latter.
At the core of this appeal is the distinction between a policy of title insurance and an uninsured abstract of title. A policy of title insurance can only be sold by a title insurer. An uninsured abstract can be sold by either a title insurer or an underwritten title company (UTC).[1] A title insurer must qualify under RCW 48.29, but a UTC need not.
Both a policy of title insurance and an uninsured abstract of title require an analysis of the ownership and security interests in the subject property. The acquisition of such information accounts for about 90 percent of the effort that goes into the issuance of a policy of title insurance. An entity that maintains such information for all properties in a local area is said to have "a title plant."[2]
A title insurer can do business with the public through its own branch office or through an agency contract with a UTC. In the former instance, the insurer maintains the title plant, prepares the necessary abstract, and issues the policy in its own name. In the latter instance, the UTC maintains the title plant, prepares the abstract, and issues the policy in the title insurer's name. In either case, the parties to the insurance contract are the title insurer and the customer.
At the times material here, First American Title Insurance Company (First American) was a qualified title insurer in Washington. It issued policies of title insurance through several UTC's with whom it had agency contracts. Each UTC collected 100 percent of the premium due from the customer, retained 90 percent as compensation for preparing the abstract of title, and remitted 10 percent to First American as compensation for providing the insurance. First American reported the 10 percent as income and paid B & O tax accordingly. First American did not report the entire premium as income or pay B & O tax on the 90 percent kept by the UTC.[3] Each UTC continued to sell uninsured abstracts in its own name, and to retain all of the income from those sales.
The Department of Revenue audited First American for the period January 1, 1992 to December 31, 1995. It concluded that First American owed B & O tax on the entire premium charged for each policy of title insurance issued through a UTC.[4] Consequently, it assessed unpaid taxes in the *122 amount of $346,012. First American paid the and sued for a refund. The trial court denied relief, and this appeal followed.
Washington levies a B & O tax for the "privilege of engaging in business activities" within the state.[5] One such activity is "making sales at retail."[6] An entity that sells either title insurance or an uninsured abstract of title makes a "sale at retail."[7] Accordingly, it is undisputed that both First American and its UTC agents made "sales at retail" in this case.[8]
When an entity makes "sales at retail," its B & O tax is based on its "gross proceeds of sales."[9] "Gross proceeds of sales" means the "value proceeding or accruing" from a sale, without deduction for expenses.[10] "Value proceeding or accruing" means "consideration... actually received or accrued."[11]
The parties disagree over the "gross proceeds of sales" received by First American. First American claims that its "gross proceeds of sales" included only the 10 percent that it "actually received or accrued" from the UTC's. Its premise, necessarily, is that when a UTC sells a policy of title insurance, the UTC sells one product for itself (the abstract of title) and a second product for First American (the title insurance). Based on that premise, First American reasons that it sold insurance only; that the value received for such insurance was 10 percent of the premium paid by the customer; and that it should be taxed only on that 10 percent.
In contrast, the Department claims that American's "gross proceeds of sales" included not just the 10 percent that a customer pays for insurance, but also the 90 percent that a customer pays for the abstract of title. The Department's premise, necessarily, is that when a UTC sells a policy of insurance, it sells a single consolidated product on First American's behalf. Based on that premise, First American's "sale at retail" involved both the abstract of title and the title insurance, and First American's tax should be based on the "Value proceeding or accruing" from both (the entire amount paid by the customer).
In light of these claims, we must inquire whether the UTC is selling the abstract for itself and the insurance for First American, or both the abstract and the insurance for First American. Our goal in making that inquiry is to select the alternative that best reflects the substance of First American's business.[12]
For several reasons, we think that a title insurer operating like First American provides and sells title insurance, but not the abstract of title. The abstract is prepared by the UTC, not by the title insurer. The abstract is capable of being sold, and sometimes is sold, separately from the insurance.[13] The abstract is valued separately from the insurance; it seems standard within the industry that insurers and UTC's value the abstract at 90 percent and the insurance at 10 percent of the total premium charged to the customer. As between the insurer and the UTC, the abstract is paid for separately; the UTC receives and keeps 90 percent as compensation for the abstract, and the insurer receives and keeps 10 percent for the insurance. Cumulated, these facts show that the substance of the insurer's business is to provide, sell, and be compensated for insurance only, while the substance of the UTC'S business is to prepare, sell and be compensated for the abstract of title.
This result is consistent with Fidelity Title Co. v. Department of Revenue.[14] The court there resolved what is undisputed here: that *123 a UTC makes "sale[s] at retail" within the meaning of RCW 82.04.050(3)(b). More importantly for our purposes, the court also considered the abstract of title and title insurance in the same way as we do today. It said:
Fidelity [a UTC] generates business for its own account. It places the relatively small insurance component with an insurer qualified, by reason of compliance with financial requirements, to underwrite the slight risk that Fidelity has not properly done its work.[15]
This result is not affected by Impecoven v. Department of Revenue.[16]Impecoven holds, as stated in the Department's brief, that "each B & O taxpayer pays tax based on the value of the business done by that taxpayer, without any reference to the B & O tax liability of any other related taxpayer."[17] As applied to the facts here, Impecoven means only that First American pays B & O tax on the insurance product that it provided and sold, but not on the abstract of title that it did not provide or sell.[18]
Our result is not affected by the Department's argument that if First American pays tax on only 10 percent, it will be deducting expenses contrary to the legislature's definition of "gross proceeds" at sales.[19] In our view, however, First American will be paying tax on all that it provided and sold.
The Department's remaining arguments lack merit or need not be reached. The judgment entered below is reversed, and the case is remanded for further proceedings.[20]
SEINFELD, J., and ARMSTRONG, A.C.J., concur.
NOTES
[1] When an abstract is sold by a UTC, it may be called a limited liability report or report for court proceedings. Thus, the standard agreement between First American and its UTC's provided:

Limited Liability Reports and Reports of Court Proceedings are not deemed title commitments within the intent of this Contract and shall be issued only in the name of the [UTC], and the [UTC] hereby agrees to hold [the title insurer] harmless against any claim or lien arising thereunder. All services performed and all reports and certificates issued, which involve only abstracting or reporting of recorded documents or legal proceedings, including but not limited to conventional abstracts of title, line abstracts, escrow services, statements of necessary parties to legal proceedings, tract ownership data not involving examination of title and tax registration services shall be performed and issued in the name of the [UTC] only and shall not be deemed title commitments....
Exh. A at 5.
[2] "A `title plant' means the materials, including tract indices and other records, necessary to accurate title searches." Fidelity Title Co. v. Department of Revenue, 49 Wash.App. 662, 663 n. 1, 745 P.2d 530 (1987), review denied, 110 Wash.2d 1010 (1988).
[3] The UTC paid B&O tax on this 90 percent.
[4] The Department was also taxing each UTC for 90 percent of the premium received for each policy of title insurance.
[5] RCW 82.04.220.
[6] RCW 82.04.250(1).
[7] RCW 82.04.050(3)(b).
[8] Id.; Fidelity, 49 Wash.App. at 667, 745 P.2d 530.
[9] RCW 82.04.250(1).
[10] RCW 82.04.070.
[11] RCW 82.04.090.
[12] Time Oil Co. v. State, 79 Wash.2d 143, 147, 483 P.2d 628 (1971); Fidelity, 49 Wash.App. at 666-67, 745 P.2d 530.
[13] Indeed, in the last century, prior to the inception of title insurance, the abstract was always prepared and sold as a separate product.
[14] Fidelity Title Co. v. Department of Revenue, 49 Wash.App. 662, 745 P.2d 530 (1987).
[15] Fidelity, 49 Wash.App. at 669-70, 745 P.2d 530.
[16] Impecoven v. Department of Revenue, 120 Wash.2d 357, 841 P.2d 752 (1992).
[17] Brief of Respondent at 12. See Impecoven, 120 Wash.2d at 364, 841 P.2d 752.
[18] We are not asked to decide whether the Department may "pyramid" the 10 percent that the UTC remits to the insurer for the insurance component of a title policy, and we express no opinion on that issue.
[19] RCW 82.04.070.
[20] We note but do not rely on Ticor Title Ins. Co., 1994 Cal. Tax. Lexis 15 (Jan. 5, 1994). It mirrors this case in both facts and result. See also Title Ins. Co. v. State Bd. of Equalization, 4 Cal.4th 715, 14 Cal.Rptr.2d 822, 842 P.2d 121 (1992) (remanding on procedural grounds only).