92 Cal.Rptr.2d 560 (2000)
77 Cal.App.4th 1371
Bruce SWEATMAN III, Plaintiff and Appellant,
v.
DEPARTMENT OF VETERANS AFFAIRS, Defendant and Respondent.
No. E022817.
Court of Appeal, Fourth District, Division Two.
February 4, 2000.
Review Granted May 10, 2000.
*561 Law Offices of Robert K. Scott and D. Scott Mohney, Newport Beach, for Plaintiff and Appellant.
Arnulfo Hernandez, Jr., Elizabeth C. Wied, Frank Perez Tays, Bruce A. Crane, Sacramento, and Patrick Ramirez S. Bupara, San Francisco, for Defendant and Respondent.

OPINION
RICHLI, J.
The state Department of Veterans Affairs (the Department) made a home mortgage loan to Bruce Sweatman III (Sweatman), a veteran. For an additional payment, it also provided Sweatman with life and disability coverage. This meant that, if Sweatman died or became disabled, he would not have to make payments on the loan; an insurance company, which the Department had hired to administer its life and disability coverage program, would take the amount of the payments out of a bank account funded by the Department and would repay that amount to the Department.
When Sweatman in fact became disabled, however, the Department purported to rescind his disability coverage, claiming he had made material misrepresentations regarding his health history. A jury, finding no breach of contract, returned a verdict for the Department.
Sweatman appeals. He contends the disability coverage was insurance which, under the Insurance Code, the Department was not entitled to rescind. We disagree, and we will affirm.

I

FACTUAL BACKGROUND

A. The Plan.

Pursuant to the Veterans' Farm and Home Purchase Act of 1974 (Mil. & Vet. Code, § 987.50 et seq.), the Department makes home and farm mortgage loans to veterans.[1] As part of the loan contract, the borrower must "agree[], as required by Department, to maintain accident, *562 health, life or disability insurance payable to the Department.... Said insurance shall be in such form and administered or provided by such companies as Department may determine...."
The Department requires all borrowers to apply for its "Home Protection Plan of Life and Disability Coverage for Cal-Vet Purchasers" (the Plan). The Plan includes both "life coverage," generally defined as payment of the unpaid balance of the loan in the event the veteran dies, and "disability benefits," generally defined as monthly payments on the loan in the event the veteran becomes totally disabled. To obtain life coverage, a borrower must "submit satisfactory evidence of insurability" and pay a monthly premium. To obtain disability coverage, the borrower must qualify for life coverage; the borrower also must be employed and must pay an additional monthly premium. The disability coverage excludes any disability resulting from a preexisting condition.

B. The Administration of the Plan.

The Department is statutorily authorized to "enter[] into a master agreement with one or more insurance companies to provide life or disability insurance coverage" for veterans to whom it has made loans. (Mil. & Vet.Code, § 987.88, subd. (a).)
The Department has entered into a "Master Agreement" with Pacific Mutual Life Insurance Company (Pacific Mutual). Under the Master Agreement, Pacific Mutual acts as administrator of the Plan. Pacific Mutual calculates annually, using actuarial methods, the contribution necessary to fund the Plan. The Department then deposits this amount into a bank account. Borrowers' premiums are also deposited into this bank account.
Pacific Mutual is responsible for reviewing and approving applications for coverage. It is also responsible for reviewing, investigating, and approving claims. Once it approves a claim, it pays the amount of the claim, out of the bank account, to the Department. If the bank account proves insufficient, the Department may make an additional contribution; under no circumstances is Pacific Mutual to be liable for any shortfall. The Master Agreement provides: "The coverages provided under the Plan will be a form of self-funded benefits as between the Department and each Participant."

C. Sweatman's Dealings With the Department.

In February 1988, Sweatman applied to the Department for a home loan. In April 1988, he submitted an application for life and disability coverage under the Plan. According to Sweatman's application, he had not been in a hospital within the preceding ten years; the only doctor he had seen in the preceding five years was a Dr. Pepitone; the only medical treatment he had received in the preceding five years consisted of premarital HIV testing and treatment for a sore left shoulder; and he had never been treated for any nervous or mental disorder.
Actually, in September 1986, a counselor had told him he might have bipolar disorder. He was referred to Dr. Whiteley, a psychiatrist. Dr. Whiteley had him admitted to a hospital with a diagnosis of "major depression." Dr. Whiteley also prescribed antidepressant medication. Dr. Whiteley thought Sweatman might have bipolar disorder; he wanted to prescribe lithium, but Sweatman refused to try it. Two days after Sweatman was released from the hospital, he was readmitted, again with a diagnosis of "major depression." After his release, Dr. Whiteley continued to treat him for depression, until April 1987.
In or about July 1988, the Department's loan to Sweatman closed. Because he had reported a previous problem with his left shoulder, the Department added a rider to his disability coverage which excluded any disability resulting from "injury to or disease of [his] left shoulder."
*563 In 1992, Sweatman became totally disabled due to what was then diagnosed as bipolar disorder. In April 1993, he sent Pacific Mutual a claim for disability benefits. In it, he indicated the first time he had consulted a doctor regarding his disability had been in July 1986. On August 23, 1993, Pacific Mutual notified Sweatman it was rescinding his disability coverage on the ground that he had made material misrepresentations about his medical history.

II

PROCEDURAL BACKGROUND
The operative complaint stated a single cause of action, for breach of contract. The Department's answer has not been included in the record.
On February 24, 1998, the case was called for trial. The Department filed a written motion in limine for a ruling that the Plan was not insurance. The trial court denied the motion.
On February 25, 1998, a jury trial began. On March 5, 1998, Sweatman filed a motion for a directed verdict in which he argued the Plan was insurance. The trial court denied the motion. Accordingly, the case went to the jury.
On March 10, 1998, the jury, by special verdict, found that the Department did not breach the contract by rescinding Sweatman's disability benefits.
On March 20, 1998, Sweatman filed a motion for judgment notwithstanding the verdict (JNOV) in which he argued again that the Plan was insurance. On April 6, 1998, the trial court entered judgment in favor of the Department and against Sweatman. On April 24, 1998, the trial court denied Sweatman's motion for JNOV. On June 4, 1998, Sweatman filed a notice of appeal from the order denying his motion for JNOV.

III

DISABILITY COVERAGE UNDER THE PLAN AS "INSURANCE"

A. Standard of Review.

Sweatman appealed exclusively from the order denying his motion for JNOV.[2] Given this specific and unambiguous designation, we cannot treat this as an appeal from the judgment. (Unilogic, Inc. v. Burroughs Corp. (1992) 10 Cal.App.4th 612, 624-625, 12 Cal.Rptr.2d 741; Norman I. Krug Real Estate Investments, Inc. v. Praszker (1990) 220 Cal.App.3d 35, 46-17, 269 Cal.Rptr. 228.) Therefore, Sweatman can raise only contentions that challenge the denial of his motion for JNOV. For example, we need not consider his contention that the denial of his earlier motion for a directed verdict left the jury without "essential guidance" for its deliberations.
"`"A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citation.]'" (Clemmer v. Hartford Insurance Co. (1978) 22 Cal.3d 865, 878, 151 Cal.Rptr. 285, 587 P.2d 1098, quoting Hauter v. Zogarts (1975) 14 Cal.3d 104, 110, 120 Cal.Rptr. 681, 534 P.2d 377, quoting Brandenburg v. Pac. Gas & Elec. Co. (1946) 28 Cal.2d 282, 284, 169 P.2d 909.) "The same standard of review applies to the appellate court.... [Citation.]" (Osborn v. Irwin Memorial Blood Bank (1992) 5 Cal.App.4th 234, 259, 7 Cal. Rptr.2d 101.)

B. Sweatman's Contention and Its Significance.

Sweatman's sole contention is that disability coverage under the Plan was "insurance" *564 governed by the Insurance Code. This issue is relevant because treating the disability coverage as insurance could have a significant impact on the Department's right to rescind.
First, under Insurance Code section 10350.2, a disability policy must contain an incontestability provision. The disability coverage portion of the Plan did not contain such an incontestability provision.[3] Nevertheless, if Insurance Code section 10350.2 applies, presumably the disability coverage must be deemed to have become incontestable.
Second, Insurance Code section 10381.5 provides: "The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof." The Department did not give Sweatman a copy of his application until after he made a claim. Thus, if Insurance Code section 10381.5 applies, the Department presumably could not use any of the statements in Sweatman's application as grounds for to rescind his disability coverage.
We may assume, without deciding, that the applicability of these statutes turned solely on whether disability coverage under the Plan was "insurance." (But see Ins.Code, §§ 10270,10271.)[4]

C. Analysis.

"Insurance is defined as `a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.' ([Ins.Code,] § 22.) Case law has interpreted this statute as requiring two elements: `(1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons. [Citations.]' [Citation.]" (Title Ins. Co. v. State Bd. of Equalization (1992) 4 Cal.4th 715, 725-726, 14 Cal.Rptr.2d 822, 842 P.2d 121, quoting Metropolitan Life Ins. Co. v. State Bd. of Equalization (1982) 32 Cal.3d 649, 654, 186 Cal.Rptr. 578, 652 P.2d 426.)
However, "`... the mere fact that a contract contains these two elements [shifting and distribution of risk of loss] does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation.' [Citation.] Rather than simply look to whether the contract involves an assumption of a risk, we will instead ask `"whether that [assumption of risk] or something else to which it is related in the particular plan is its principal object and purpose."' [Citations.]" *565 (Title Ins. Co. v. State Bd. of Equalization, supra, 4 Cal.4th at p. 726,14 Cal.Rptr.2d 822, 842 P.2d 121, quoting Truta v. Avis Rent A Car System, Inc. (1987) 193 Cal.App.3d 802, 812, 238 Cal. Rptr. 806, and Transportation Guar. Co. v. Jellins (1946) 29 Cal.2d 242, 249, 174 P.2d 625, respectively.)
Truta v. Avis Rent A Car System, Inc., supra, 193 Cal.App.3d 802, 238 Cal.Rptr. 806 is closely in point. There, the defendants were car rental companies which allegedly offered their customers a collision damage waiver. Under the defendants' standard contracts, any renter who did not buy a collision damage waiver would have to pay the rental company for any damage to the car; any renter who did buy a collision damage waiver would not have to pay the rental company for such damage. (Id., at p. 807, 238 Cal.Rptr. 806.)
The appellate court held the collision damage waiver was not insurance. (Truta v. Avis Rent A Car System, Inc., supra, 193 Cal.App.3d at pp. 812-815, 238 Cal. Rptr. 806.) It conceded that "a persuasive argument can be made" that the collision damage waiver did involve both a shifting of the risk of loss and the distribution of that risk. (Id., at p. 812, 238 Cal.Rptr. 806.) It noted, however, "`[t]he question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose.' [Citation.]" (Id., at p. 814, 238 Cal.Rptr. 806, quoting Transportation Guar. Co. v. Jellins, supra, 29 Cal.2d at p. 249, 174 P.2d 625.) "The principal object and purpose of the transaction before us ... is the rental of an automobile. Peripheral to that primary object is an option, available to the lessee for additional consideration, to reallocate the risk of loss ... to the lessor in the event the vehicle sustains damage during the rental term." (Id, at p. 814, 238 Cal.Rptr. 806.)
The court also relied on a memorandum opinion in which Department of Insurance had concluded that a collision damage waiver was not insurance. (Truta v. Avis Rent A Car System, Inc., supra, 193 Cal. App.3d at pp. 809-810, 814-815, 238 Cal. Rptr. 806.) As the court quoted the memorandum: "`[T]his is not a spreading of risk within insurance concepts, but is rather an allocation of risk by contractual agreement. As the parties can contract to place full responsibility for damage on the lessee, it seems no less reasonable that they can contract to place this responsibility on the lessor.'" (Id., at p. 815, 238 Cal.Rptr. 806.) `"If the situation were such that the lessor was agreeing to pay any monies to third parties, then this conclusion would be different.... Here, there is no interest of the public which would be protected by our assuming jurisdiction. Since the lessor is not agreeing to pay anybody anything, but is simply agreeing not to hold the lessee liable, there is no need for accumulating reserves.'" (Ibid.)
We are unable to distinguish disability coverage under the Plan in this case from the collision damage waiver in Truta. The principal object and purpose of the overall transaction between Sweatman and the Department was financing the purchase of a home. The disability coverage was merely an optional and incidental element of this overall transaction. More important, the disability coverage itself merely allocated a particular risk  the risk of Sweatman's disability  as between the two parties to that transaction. The Department did not agree to pay anything to any third party, or even directly to Sweatman. It simply agreed not to hold Sweatman liable for the mortgage payments under certain conditions.
In addition, much as in Truta, the Department of Insurance has taken the position that the Plan is not insurance. If a veteran requests assistance from the Department of Insurance regarding disability coverage under the Plan, it refers the matter to the Department of Veterans Affairs; it sends the veteran a form letter which states: "[Y]our inquiry does not relate to a *566 matter within the jurisdiction of this Department...."
Sweatman understandably points to several instances in which the Department and others referred to the Plan as "insurance." For example, the authorizing statute permits the Department to enter into master agreements with "insurance companies to provide life or disability insurance coverage...." (Mil. & Vet.Code, § 987.88, subd. (a).) The Department's loan contract requires the borrower to maintain "life or disability insurance, payable to Department...." The Department's cover letter enclosing the application for life and disability coverage under the Plan describes it as an "Application for Insurance." To qualify for both life and disability coverage under the Plan, the borrower must submit "evidence of insurability...." The borrower's application is then "rated as standard or uninsurable."
These references do not affect our conclusion. We readily admit, as did the court in Truta, that the transaction at issue involves the insurance-like functions of shifting and distributing a risk of loss. If the Department had offered otherwise identical protection against liability to a third party, rather than to itself, such an arrangement would clearly be insurance. (See Grand Rent A Car Corp. v. 20th Century Ins. Co. (1994) 25 Cal.App.4th 1242, 1251-1253, 31 Cal.Rptr.2d 88 [car rental company's agreement to indemnify renter against liability to third persons was insurance]; Hertz Corp. v. Home Ins. Co. (1993) 14 Cal.App.4th 1071, 1077-1078 and 1077, fn. 5, 18 Cal.Rptr.2d 267 [same; distinguishing Truta]; Nathanson v. Hertz Corp. (1986) 183 Cal.App.3d 78, 79-85, 227 Cal.Rptr. 799 [same].) Thus, it was only natural for the Department and others to refer to disability coverage under the Plan as insurance.
This colloquial usage, however, is not controlling. The question before us is whether disability coverage under the Plan was insurance within the meaning of the Insurance Code. As already noted, to answer this question, we must look beyond the threshold question of whether shifting and distribution of loss are involved to the overriding question of whether these insurance-like functions were the principal object and purpose of the transaction. They were not.
We conclude that, as a matter of law, disability coverage under the Plan was not insurance within the meaning of the Insurance Code. A fortiori, there was substantial evidence to support the verdict in favor of the Department. Accordingly, the trial court did not err by denying Sweatman's motion for JNOV.

IV

DISPOSITION
The judgment is affirmed. The Department shall recover costs on appeal against Sweatman.
RAMIREZ, P.J., and McKINSTER, J., concur.
NOTES
[1] Technically, the Department first buys the house or farm; it then enters into an installment land sale contract with the veteran. (Mil. & Vet.Code, §§ 987.60, subd. (a), 987.69; Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs (1998) 67 Cal.App.4th 743, 756-757, 79 Cal.Rptr.2d 248.)
[2] Sweatman did not even request a reporter's transcript of the proceedings at trial; he requested only a transcript of the hearing on his motion for JNOV. Fortunately for Sweatman, the Department, by filing a counter-designation, requested a transcript of the entire trial.
[3] The Plan did contain an express incontestability provision with respect to life coverage. Initially, the Department rescinded the entire Plan; eventually, however, it acknowledged that Sweatman's life coverage had become incontestable and reinstated it. Accordingly, no issue is presented with respect to whether life coverage under the Plan is "insurance."
[4] Sweatman also seeks to rely on Insurance Code sections 10113 and 10270.6, subdivision (b).

Insurance Code section 10113 provides, as pertinent here: "Every policy of life, disability, or life and disability insurance ... shall contain and be deemed to constitute the entire contract between the parties and nothing shall be incorporated therein by reference to any . . . application or other writings, of either of the parties thereto or of any other person, unless the same are indorsed upon or attached to the policy...."
A claim, however, that the insured's application contained material misrepresentations does not seek to "incorporate" the application within the meaning of this section. (Metzinger v. Manhattan Life Ins. Co. (1969) 71 Cal.2d 423, 427, 78 Cal.Rptr. 463, 455 P.2d 391.)
Insurance Code section 10270.6, subdivision (b), provides, as pertinent here: "Every group disability master policy shall contain the following provisions: [¶] ... [¶] (b) A provision that the insurer will issue to the policyholder for delivery to the individuals insured under such policy, an individual certificate setting forth a statement as to the insurance protection to which he is entitled..."
Even assuming, however, the Plan constituted disability insurance, it clearly did not constitute "group disability insurance" within the meaning of Insurance Code section 10270.6. (See Ins.Code, §§ 10270.5, 10270.505, 10270.57, 10270.97.)